IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LOCAL ACCESS, LLC,
a Florida Limited Liability Company; and
BLITZ TELECOM CONSULTING, LLC,
a Florida Limited Liability Company,

       Plaintiffs,                           Case No. 6:20-cv-2315-PGB-GJK

vs.

KELLEY DRYE & WARREN, LLP,
a New York Limited Liability Partnership;
HENRY KELLY;
CATHERINE JAMES;
PEERLESS NETWORK, INC.,
an Illinois Corporation; and
RICHARD KNIGHT;

       Defendants.

_____/

## THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COME NOW the Plaintiffs, LOCAL ACCESS, LLC and BLITZ TELECOM CONSULTING, LLC, by and through their undersigned counsel and sue the Defendants, KELLEY DRYE & WARREN, LLP, HENRY KELLY, CATHERINE JAMES, PEERLESS NETWORK, INC., and RICHARD KNIGHT , and state:

## PARTIES

1.     LOCAL ACCESS, LLC ("Local Access") is a limited liability company organized under the laws of the State of Florida.   Local Access is licensed and regulated as a Competitive Local Exchange Carrier (CLEC) authorized to provide telecommunication services throughout the State of Florida, including Orange County.

2.     The sole member of Local Access is Robert Russell.

3.      BLITZ TELECOM CONSULTING, LLC ("Blitz") is a limited liability company organized under the laws of the State of Florida.

4.      The members of Blitz are: Robert Russell and James L. Finneran.

5.      Robert Russell is *sui juris*, and is domiciled in and is a citizen of Orange County, Florida.

6.      James L. Finneran is *sui juris*, and is domiciled in and is a citizen of Carroll County, Maryland.

7.      Local Access, as a telecommunications carrier, receives revenue based upon network traffic and direct customer payments for services.

8.      Blitz is a communications services aggregator that is a customer of Local Access.  Blitz receives revenue from its customers from communication services including traffic and/or volume related solutions and direct customer payments for services.  Local Access, in turn, receives revenue based upon Blitz customer network traffic.

9.      KELLEY DRYE & WARREN, LLP ("KDW") is a limited liability partnership organized under the laws of the State of New York, and has offices for the normal transaction of business in various cities, including Chicago, Cook County, Illinois.  At all relevant times, KDW was a law firm.

10.     HENRY KELLY ("Henry Kelly") is *sui juris*, and is domiciled in and is a citizen of Dupage County, Illinois, and was, at all relevant times, a partner in the law firm of KDW and the managing partner of KDW's Chicago office.

11.     CATHERINE JAMES ("Catherine James") is *sui juris*, and is domiciled in and is a citizen of Kane County, Illinois, and was, at all relevant times, an associate with the law firm of KDW, practicing under the supervision of Henry Kelly.

12.     PEERLESS NETWORK, INC. ("Peerless") is an Illinois corporation, with its principal place of business in Chicago, Illinois.  Peerless (and/or its wholly owned subsidiary through which it does business in Florida) is licensed and regulated as a Competitive Local Exchange Carrier (CLEC) authorized to provide  telecommunication services throughout the State of Florida, including Orange County.

13.     RICHARD KNIGHT ("Richard Knight") is *sui juris*, and is domiciled in and is a citizen of Miami-Dade County, Florida, and was, at all relevant times, a founder of Peerless, a shareholder in Peerless, and the executive vice-president of sales and marketing of Peerless.

14.     At all times material hereto, KDW acted through its agents Henry Kelly and Catherine James, among others.

15.     At all times material hereto, Peerless acted through its agents Richard Knight, Bob Sherman, and Scott Kell among others.

## JURISDICTION AND VENUE

16.     This is an action for misappropriation of trade secrets pursuant to the federal Defend Trade Secrets Act (18 U.S.C. §§ 1831, *et seq.*) (hereinafter "the DTSA"); for misappropriation of trade secrets pursuant to the Florida Uniform Trade Secrets Act, (§§688.001, *et seq.*, Fla. Stat.) (hereinafter "the FUTSA"); for misappropriation of trade secrets pursuant to the Illinois Trade Secrets Act (765 ILCS §§1065/1, *et seq.*)

(hereinafter "the ITSA"); and for violation of the Telecommunications Act of 1996, (47 U.S.C. §§ 201, *et seq.*) (hereinafter "the Telecom Act").

17.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over the claims under the federal Defend Trade Secrets Act and the federal Telecommunications Act of 1996.

18.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the claims under the Florida Uniform Trade Secrets Act and the Illinois Trade Secrets Act, as these claims are so related to the claims in this action within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

19.     KDW was legal counsel for Peerless in several cases brought by the plaintiffs in the United States District Court for the Middle District of Florida, Orlando Division, including *Blitz vs. Peerless*, Case No. 6:14-cv-307 (hereinafter, "Case I"), *Local Access and Blitz vs. Peerless*, Case No. 6:14-cv-399 (hereinafter, "Case II"), and  *Local Access vs. Peerless*, Case No. 6:17-cv-236 (hereinafter, "Case III").

20.     In connection with all such representation, including the representation of Peerless in Case III, Henry Kelly and Catherine James (who are not members of the Florida Bar and are not members of the bar of the United States District Court, Middle District of Florida) applied for and received special admission to practice in the United States District Court for the Middle District of Florida, Orlando Division, *pro hac vice*.

21.     All or substantial portions of the events or omissions giving rise to the claims brought herein occurred as a result of KDW's, Henry Kelly's and Catherine James's representation of Peerless in this Court in Case III; the production of

documents by Local Access in Case III under the terms of a  Protective Order

Governing the Production of Discovery Material entered in Case III as Docket Entry 44

(the "Protective Order"); and Defendants' use and dissemination of the produced

Confidential and Highly Confidential in violation of the Protective Order and in ways that

were not permissible in the litigation and were unrelated to the litigation.  A copy of the

Protective Order is attached hereto as **Exhibit 1**.

22.     While this Case is related to Case III, the claims brought herein were

separated from the sanctions proceedings regarding violations of the Protective Order in

Case III, and this Court recognized in its January 11, 2019 Order in Case III that if the

plaintiffs were to bring claims for damages against Peerless and KDW for violations of

the Protective Order, they would be brought in a separate action.  A copy of the January

11, 2019 Order in Case III is attached hereto as **Exhibit 2**.

23.     Additionally, a provision of the Telecommunications Act of 1996, 47 U.S.C.

§ 207, provides that "[a]ny person claiming to be damaged by any common carrier

subject to the provisions of this chapter . . . may bring suit for the recovery of the

damages for which such common carrier may be liable under the provisions of this

chapter, in any district court of the United States of competent jurisdiction."

24.     Accordingly, venue is proper in this Court pursuant to 28 U.S.C. § 1391.

### GENERAL ALLEGATIONS

25.     On November 9, 2010, Blitz and Peerless entered into a contractual

agreement, the "Customer Agreement – IP Control," wherein Peerless agreed to

provide services for the benefit of Blitz and its customers, and, generally, to route

telecommunications traffic for Blitz's customers.

26.     Blitz subsequently had to sue Peerless in Case I, in the United States District Court for the Middle District of Florida, Orlando Division, for the enforcement of that agreement, resulting in a multi-million-dollar judgment against Peerless which was upheld on appeal.

27.     KDW, Henry Kelly and Catherine James represented Peerless in Case I.

28.     Effective June 1, 2012, Local Access and Peerless entered into a contractual agreement, the "Customer Agreement - Homing Tandem Service." wherein Peerless agreed to provide "Homing Tandem Service" for the benefit of Local Access and its customers.

29.     Local Access and Blitz subsequently had to sue Peerless in Case II in the United States District Court for the Middle District of Florida, Orlando Division, for, *inter alia,* the enforcement of that agreement and Peerless's interference in Blitz's business relationships, resulting in a settlement which was disputed by Peerless, but which was enforced by the District Court and upheld on appeal.

30.     KDW, Henry Kelly and Catherine James represented Peerless in Case II.

31.     Local Access again had to sue Peerless in Case III in the United States District Court for the Middle District of Florida, Orlando Division, for breaches of the Homing Tandem Service Agreement, as amended by the settlement reached in Case II.

32.     KDW, Henry Kelly and Catherine James represented Peerless in Case III.

33.     Local Access's Case III Complaint, as amended, contained five counts, all of which were centered on Peerless' continuing breaches of and attempts to avoid its ob-ligations under a contract between Local Access and Peerless.

34.    No count contained within any complaint in Case III contained allegations implicating the issues in the instant case.

35.    Early in the discovery phase of Case III, the parties jointly moved the Court for the entry of a protective order regarding discovery, to protect Consumer Proprietary Network Information ("CPNI") from disclosure and misuse, pursuant to the Telecommunication Act of 1996, 47 U.S.C. § 222.  A copy of the Joint Motion for a Protective Order filed in Case III is attached hereto as **Exhibit 3**.

36.    The Court subsequently entered the Protective Order Governing the Production of Discovery Material on July 10, 2017 (the "Protective Order").  A copy of the Protective Order has been attached hereto as **Exhibit 1**.

37.    The Protective Order created two categories of protected litigation material: "Confidential" and "Highly Confidential."

38.    Under the Protective Order, KDW, Henry Kelly and Catherine James were allowed to share litigation materials designated as "Confidential" with only those directors, officers, and employees of Peerless who required the "Confidential" litigation material to perform his or her responsibilities in connection with Case III, but only to the extent required to perform his or her responsibilities in connection with Case III.

39.    Under the Protective Order, KDW, Henry Kelly and Catherine James were not allowed to share litigation materials designated as "Highly Confidential" with Peerless or any of its employees.

40.    Under the Protective Order, any person responsible for making copies of "Confidential" or "Highly Confidential" litigation material was required to ensure that the copies adequately reflected the confidentiality designation of those materials.

41.      Under the Protective Order, anyone who was authorized to receive "Confidential" or "Highly Confidential" litigation material was only allowed to use such material for the prosecution or defense of Case III, and was expressly prohibited from using such material for any other business, commercial, or competitive purposes.

42.      Under the Protective Order, anyone who was authorized to receive "Confidential" or "Highly Confidential" litigation material had to have been shown the Protective Order and was not allowed  to receive any "Confidential" or "Highly Confidential" litigation material unless and until they agreed in advance in writing to abide by the terms of the Protective Order.

43.      The Protective Order created a duty for any person receiving "Confidential" or "Highly Confidential" designated information to maintain the secrecy of the information and limit the use of the information to only that which was permitted under the Protective Order.

44.      In December 2017, pursuant to discovery requests in Case III made by Peerless through KDW, Local Access produced its Call Detail Records ("CDRs") for the period of August 5, 2015 through August 24, 2015, designated as "Confidential," which contained Plaintiffs' proprietary customer names (constituting a "customer list" as that term is used in the FUTSA and a "list of actual…customers" as that term is used in the ITSA and "business. . .information as that term is used in the DTSA); proprietary traffic information (constituting "information" that derived independent information from its secrecy as that term is used in the FUTSA, "business information" as that term is used in the DTSA, and a "pattern" of "information" as those terms are used in the ITSA) such as call routing information, minutes of use, and call volumes; other proprietary customer

information and customer identifying information (such as assigned telephone numbers, customer identification codes, and coding customized to the customers at their request); technical data (as that term is used in the ITSA and the DTSA) such as Machine Egress information, SIP Group IP information and IP Address Out information; and other CPNI of Local Access, Blitz, their customers, and their customers' customers (hereinafter, the "December 2017 Production").

45.    In January 2018, pursuant to discovery requests in Case III made by Peerless through KDW, Local Access produced its Call Detail Records ("CDRs") for the period of August 2015 through December 2017, designated as "Highly Confidential," which contained Plaintiffs' proprietary traffic information (constituting "information" that derives independent value based on its secrecy as that term is used in the FUTSA, "business information" as that term is used in the DTSA, and a "pattern" of "information" as those terms are used in the ITSA) such as call routing information, minutes of use, and call volumes, other proprietary customer information and customer identifying information (such as assigned telephone numbers, customer identification codes, and coding customized to the customers at their request); technical data (as that term is used in the ITSA and the DTSA) such as Machine Egress information, SIP Group IP information and IP Address Out information; and other CPNI of Local Access, Blitz, their customers, and their customers' customers (hereinafter, the "January 2018 Production").

46.    In April 2018, pursuant to discovery requests in Case III made by Peerless through KDW, Local Access produced its CDRs for Plaintiffs' traffic routed through Local Access and Inteliquent, designated as "Highly Confidential," which contained

Plaintiffs' proprietary traffic information (constituting "information" that derives independent value based on its secrecy as that term is used in the FUTSA, "business information" as that term is used in the DTSA, and a "pattern" of "information" as those terms are used in the ITSA) such as call routing information, minutes of use, and call volumes; proprietary customer information and customer identifying information (such as assigned telephone numbers, customer identification codes, coding customized to the customers at their request, and customer growth or contraction patterns); information relative to traffic routed through Peerless's competitor, Inteliquent (such as traffic volume, customer identifying information, assigned phone numbers of customers, customer identification codes), and other CPNI of Local Access, Blitz, their customers, and their customers' customers (hereinafter, the "April 2018 Production").

47.     The information contained in the December 2017 Production contained proprietary customer information owned by Plaintiffs, including but not limited to the names of Plaintiffs' customers, the names of Plaintiffs' customers' customers, telephone numbers that could be used to identify Plaintiffs' customers and their customers' customers, routing information, traffic information, technical data, DID volumes and proprietary coding information.

48.     The information contained in January 2018 Production and the April 2018 Production contained proprietary customer information owned by Plaintiffs, including but not limited to telephone numbers that could be used to identify Plaintiffs' customers and their customers' customers, routing information, traffic information, technical data, DID volumes and proprietary coding information.

49.     Plaintiffs derived independent economic value from the secrecy of this information in that the information could be used by competitors to analyze the volume of DIDs, the minutes of use, the growth or reduction in traffic, the routing information, and other information that would allow competitors to identify which of Plaintiffs' customers (and customers' customers) to target, what services to offer those so identified, and where it would be advantageous to provide credits for certain services in order to promote sales of other lucrative services.

50.     The value of the secrecy of this information is evinced, in part, by the losses that Plaintiffs incurred once Peerless obtained and used Plaintiffs' proprietary information to market to Plaintiffs' customers and customers' customers.

51.     The CDRs contained in the December 2017 Production, the January 2018 Production and the April 2018 Production also contain proprietary coding information that Plaintiffs developed for ease of sorting and managing the data contained within the CDRs, as well as customized coding that Plaintiffs developed to address specific requests of their customers.

52.     The creation and use of these codes, and the codes themselves, are not industry practice and standard, and are unique developments that Plaintiffs use to analyze their own status with customers and financial standing, as well as to market to their existing and potential customers.  Plaintiffs' willingness and ability to provide customized coding for customers provide Plaintiffs with a marketing advantage over larger carriers and aggregators, thereby providing Plaintiffs with independent economic value through the secrecy of that information.

53.     Local Access's CDRs that Defendants obtained in the December 2017 Production, the January 2018 Production and the April 2018 Production contain Plaintiffs' trade secret information that Defendants would not have from their own records, including but not limited to Machine Egress information, IP Address Out information, SIP Group IP information, Confirmation Code Track ID information, and customized codes specific to particular customers.

54.     Each of these categories of information are protected by Plaintiffs, have inherent economic value in their secrecy, would cause economic harm to Plaintiffs and economic advantage to competitors if disclosed to competitors, caused actual economic harm to Plaintiffs when misappropriated by Defendants, and caused actual economic gain for Peerless when misappropriated by Defendants.

55.     Local Access does not share its complete CDRs and the trade secret information therein with other carriers in the ordinary course of business.

56.     Even when some CDR content must be provided to other carriers for billing purposes, technical purposes, or customer service purposes, Local Access provides only the pertinent portions of their CDRs to the other carriers as necessary and withholds information from the CDRs that is protected and/or impertinent.

57.     Local Access's CDRs constitute a "compilation" of customer information, customer usage information, and technical data that is expressly protected as "trade secret" pursuant to the FUTSA, the DTSA and the ITSA.

58.     Local Access's CDRs constitute "technical data" that is expressly protected as "trade secret" pursuant to the ITSA and the DTSA.

59.     The Machine Egress information, IP Address Out information, and SIP Group IP Information contained in Local Access's CDRs constitute "technical data" that is expressly protected as "trade secret" pursuant to the ITSA and the DTSA.

60.     The Machine Egress information, IP Address Out information, and SIP Group IP Information contained in Local Access's CDRs demonstrate a "pattern" of customer usage, which are expressly protected as "trade secret" pursuant to the ITSA, the DTSA and the FUTSA.

61.     The traffic and routing information contained in Local Access's CDRs reveals the "pattern" of customer usage, which is expressly protected as "trade secret" pursuant to the ITSA, the FUTSA and the DTSA.

62.     The proprietary codes in Local Access's CDRs reveal Local Access's "method," "technique," and "process" for providing certain services; all of which are expressly protected as "trade secret" pursuant to the ITSA, the DTSA and the FUTSA.

63.     Local Access's CDRs constitute "customer lists" which are "trade secret" pursuant to the FUTSA, the DTSA and the ITSA.

64.     In May 2018, pursuant to discovery requests in Case III made by Peerless through KDW, Local Access produced Local Access's contracts with five specific customers and other materials regarding outbound traffic, designated as "Highly Confidential," which contained Local Access's proprietary customer names (constituting a partial "customer list" as that term is used in the FUTSA, a partial "list of actual…customers" as that term is used in the ITSA, and "business. . .information" as that term is used in the DTSA); proprietary pricing information (constituting "financial data" and/or "economic" information as those terms are used in the DTSA and the ITSA,

as well as "information" that derives independent economic value from its secrecy as contemplated by the FUTSA); and other proprietary contract terms and information (including, but not limited to, length of commitment and minimum volume and usage requirements) that would allow Local Access's competitors an unfair competitive advantage over Local Access if made available to Local Access's competitors (hereinafter, the "May 2018 Production").

65.    Plaintiffs derived independent economic value from the secrecy of this information in that the information could be used by competitors to identify which of Plaintiffs' customers to target, what services to offer those so identified, what prices to offer them, and where it would be advantageous to provide credits for certain services in order to promote sales of other lucrative services.

66.    The value of the secrecy of this information is evinced, in part, by the near immediate use of this information by Peerless to contact at least one if not more than one of these customers in an effort to market services.

67.    Local Access's contracts that Defendants obtained in the May 2018 Production contain Plaintiffs' trade secret information that Defendants could not have from their own records, including but not limited to identification of customers, proprietary pricing information, length of terms, and minimum volume requirements.

68.    Each of these categories of information are protected by Plaintiffs, have inherent economic value in their secrecy, would cause economic harm to Plaintiffs and economic advantage to competitors if disclosed to competitors, caused actual economic harm to Plaintiffs when misappropriated by Defendants, and caused actual economic gain for Peerless when misappropriated by Defendants.

14

69.     Local Access does not share its customer contracts with all of the trade secret information to competitors in the ordinary course of business.

70.     The minimum volumes of traffic contained in Local Access's contracts reveal a "pattern" of anticipated customer usage, which is expressly protected as "trade secret" pursuant to the FUTSA, the ITSA and the DTSA.

71.     Local Access's contracts constitute a "compilation" of customer information and customer usage information that is expressly protected as "trade secret" pursuant to the FUTSA, the ITSA and the DTSA.

72.     Local Access's contracts, when taken together, constitute "customer lists" which are "trade secret" pursuant to the FUTSA, the DTSA and the ITSA.

73.     At no time before May 14, 2018 did KDW, Henry Kelly or Catherine James ever obtain written confirmation from Richard Knight or any other Peerless employee that  anyone had reviewed and would abide by the terms of the Protective Order.

74.     At no time before May 11, 2018 did KDW, Henry Kelly or Catherine James ever provide a copy of the Protective Order to Richard Knight, or the following other Peerless employees: Scott Kell, Bob Sherman, Jeff Davis, Greg Walther, Chris McDonald, Frank Trento, James Cook, Brian Brabson, or Margaret McNerny.

75.     As early as July 13, 2017, KDW did provide a copy of the Protective Order to Peerless, by transmitting the same to Peerless's Chief Executive Officer, John Barnicle, and Peerless's Compliance Officer, Julie Oost.

76.     In December 2017, at approximately the same time that KDW and Henry Kelly received the December 2017 Production, which Henry Kelly knew to contain Blitz's and Local Access's proprietary customer information, Henry Kelly and Richard Knight

discussed whether Peerless could market its services to Blitz's and Local Access's customers.

77.     Following the December 2017 discussion between Henry Kelly and Richard Knight regarding marketing to Blitz's and Local Access's customers, Peerless implemented new procedures for, and removed safeguards against, marketing to Blitz's and Local Access's customers.

78.     In January 2018, KDW through Henry Kelly and Catherine James and others, provided the December 2017 Production to Peerless, specifically to Peerless employee Scott Kell.  Mr. Kell, as Peerless's Executive Vice President of Operations and Engineering, loaded all or part of the protected ligation materials onto Peerless's internal network storage.  Peerless did not record what Peerless employee(s) accessed, downloaded, or used Local Access's and Blitz's proprietary information, despite having the capability to do so, and Peerless did not place any restrictions on the use of Local Access's and Blitz's proprietary information.  Mr. Kell noticed the "Confidential" designation on the December 2017 Production and specifically asked Henry Kelly if the materials could be shared with Peerless's Vice President of Information Technology, Bob Sherman.

79.     Despite Henry Kelly's knowledge of the content of the Protective Order, his knowledge that the December 2017 Production had been designated as "Confidential" by Local Access, and his knowledge that the December 2017 Production contained CPNI and other information that was only to be used in specific ways under the Protective Order, Henry Kelly gave Scott Kell permission to disclose the December 2017 Production to Bob Sherman and to use the December 2017 Production.  At the

time the December 2017 Production was disclosed to Peerless by KDW, Henry Kelly and Catherine James, those defendants knew or had reason to know that Scott Kell had not been provided with the Protective Order and knew or had reason to know that they had not obtained written confirmation from Scott Kell that he had reviewed and would abide by the terms of the Protective Order.

80.    At the time Henry Kelly gave Scott Kell permission to share the December 2017 Production with Bob Sherman, KDW and Henry Kelly knew or had reason to know that Bob Sherman had not been provided with the Protective Order and knew or had reason to know that they had not obtained written confirmation from Bob Sherman that he had reviewed and would abide by the terms of the Protective Order.

81.    In February 2018, KDW through Catherine James under the supervision of Henry Kelly and at his direction, worked with Peerless employees Scott Kell and Bob Sherman to use and analyze the December 2017 Production, and to compile a list of Local Access's and Blitz's customer names from the proprietary CPNI contained in the December 2017 Production.  The resulting list was a "customer list" as used in the FUTSA, a "list of actual. . .customers" as used in the ITSA, and "business…information" as that term is used in the DTSA.

82.    On February 12, 2018, KDW through Catherine James under the supervision of Henry Kelly and at his direction, disclosed the proprietary list of Local Access's and Blitz's customer names to Peerless's Executive Vice President of Sales and Marketing, Richard Knight.

83.    KDW, through Catherine James under the supervision of Henry Kelly, removed the "Confidential" designation from Local Access's and Blitz's proprietary list of customer names before disclosing the proprietary list to Richard Knight.

84.    At the time the proprietary list of Local Access's and Blitz's customer names derived from the December 2017 Production was provided to Richard Knight, KDW, Henry Kelly and Catherine James knew or had reason to know that Richard Knight had not been provided with the Protective Order and knew or had reason to know that they had not obtained written confirmation from Richard Knight that he had reviewed and would abide by the terms of the Protective Order.

85.    In February 2018, Peerless, through Richard Knight, used the list of Local Access's and Blitz's customer names derived from the December 2017 Production and disclosed the proprietary list (or a part thereof) to Peerless's Vice Presidents of Sales, Jeff Davis and Margaret McNerney; and to Peerless's Director of Customer Support, Brian Brabson.  This use and disclosure were in violation of the Protective Order and was not related to the litigation of Case III.

86.    On the same day that Richard Knight provided the proprietary list of customer names, Bob Sherman provided John Barnicle, Scott Kell, Catherine James, and Henry Kelly with a complete list of the more than 100,000 phone numbers identified in the December 2017 Production, along with the Local Access or Blitz customers' name, the number of calls made to each number, and status for each number.  This use and disclosure also were in violation of the Protective Order and was not related to the litigation of Case III.

87.    At the time the proprietary list of Local Access's and Blitz's customer names derived from the December 2017 Production (or a part thereof) was disclosed to Jeff Davis, Brian Brabson, and Margaret McNerny, Peerless and Richard Knight knew or had reason to know that Jeff Davis, Brian Brabson, and Margaret McNerny had not been provided with the Protective Order and knew or had reason to know that they had not obtained written confirmation from Jeff Davis, Brian Brabson, or Margaret McNerny that any of them had reviewed and would abide by the terms of the Protective Order.

88.    Peerless, through Richard Knight, used and disclosed the proprietary list of Local Access's and Blitz's customer names derived from the December 2017 Production (or a part thereof) to Jeff Davis, Brian Brabson, and Margaret McNerny for the purpose of marketing Peerless's services to the identified customers, which was a business, commercial, or competitive purpose specifically prohibited by the Protective Order.  This use and disclosure were not related to the litigation of Case III.

89.    Peerless employees Jeff Davis, Brian Brabson, and/or Margaret McNerny used Blitz' and Local Access's proprietary customer information to assist Richard Knight in marketing Peerless's services to Blitz's and Local Access's identified customers, which was a business, commercial, or competitive purpose specifically prohibited by the Protective Order.  This use was not related to the litigation of Case III.

90.    At the time that he disclosed Blitz's and Local Access's proprietary customer information to Jeff Davis, Richard Knight instructed Mr. Davis to use the list to market Peerless's services to those customers of Blitz and Local Access.  This use and disclosure were not related to the litigation of Case III.

91.     At the direction of Richard Knight, and on behalf of Peerless, Jeff Davis disclosed the proprietary list of Blitz's and Local Access's customers to Peerless's sales personnel, including James Cook, Greg Walther, Frank Trento, and Chris McDonald, who then used the Proprietary list of Blitz's and Local Access's customers to market to Blitz's and Local Access's identified customers. This use and disclosure were not related to the litigation of Case III.

92.     At the time the list of Local Access's and Blitz's customer names derived from the December 2017 Production (or a part thereof) was provided to Peerless employees Greg Walther, Chris McDonald, Frank Trento, and James Cook, Peerless and Richard Knight knew or had reason to know that Greg Walther, Chris McDonald, Frank Trento, and James Cook had not been provided with the Protective Order and knew or had reason to know that they had not obtained written confirmation from Greg Walther, Chris McDonald, Frank Trento, or James Cook that any of them had reviewed and would abide by the terms of the Protective Order.

93.     Jeff Davis, on behalf of Peerless and at the direction of his boss, Richard Knight, used and disclosed the proprietary list of Local Access's and Blitz's customer names derived from the December 2017 Production (or a part thereof) to Peerless employees Greg Walther, Chris McDonald, Frank Trento, and James Cook for the purpose of marketing Peerless's services to the identified customers, which was a business, commercial, or competitive purpose specifically prohibited by the Protective Order. This use and disclosure were not related to the litigation of Case III.

94.     Peerless employees Greg Walther, Chris McDonald, Frank Trento, and/or James Cook contacted and made efforts to contact Local Access's and Blitz's

20

customers for the purpose of marketing Peerless's services, which was a business, commercial, or competitive purpose specifically prohibited by the Protective Order.  This use was not related to the litigation of Case III.

95.   In February and March of 2018, Richard Knight and Catherine James discussed Peerless's progress in marketing to the proprietary list of Blitz's and Local Access's customers that was derived from the December 2017 Production.  This discussion was not related to the litigation of Case III.

96.   Local Access designated the January 2018 Production "Highly Confidential" by including the words "Highly Confidential" in each of the filenames of the electronically produced sets of CDRs.

97.   Pursuant to the Protective Order, KDW, Henry Kelly and Catherine James were prohibited from disclosing the contents of the January 2018 Production to Peerless or any of its employees because it was designated as "Highly Confidential" by Local Access.

98.   KDW partner, Henry Kelly, instructed KDW associates, Catherine James and Brittany McElmury, to disclose the January 2018 Production to Peerless employees.

99.   KDW through Henry Kelly, Catherine James, and others, disclosed the contents of the January 2018 Production designated as "Highly Confidential" to Peerless employees Scott Kell and Bob Sherman.  This disclosure was not permissible in the litigation of Case III.  Mr. Kell, as Peerless's Executive Vice President of Operations and Engineering, loaded all or part of the protected ligation materials onto Peerless's internal network storage.  This use was not permissible in or related to the

litigation of Case III.  Peerless did not record what Peerless employee(s) accessed, downloaded, or used Local Access's and Blitz's proprietary information and Peerless did not place any restrictions on the use of Local Access's and Blitz's proprietary information.

100.   When Henry Kelly instructed Catherine James to disclose the contents of the January 2018 Production to Peerless, Henry Kelly knew or had reason to know that such contents were designated as "Highly Confidential."

101.   When Catherine James instructed KDW associate Brittany McElmury to disclose the contents of the January 2018 Production to Peerless, Catherine James knew or had reason to know that such contents were designated as "Highly Confidential."

102.    When Brittany McElmury instructed the KDW discovery services group to disclose the contents of the January 2018 Production to Peerless, KDW associate Brittany McElmury knew or had reason to know that such contents were designated as "Highly Confidential."

103.   At all times material hereto, KDW's discovery services group knew or had reason to know that the January 2018 Production had been designated as "Highly Confidential" by Local Access.

104.   KDW, Henry Kelly and Catherine James failed to provide the KDW discovery services group with a copy of the Protective Order, or put any safeguards in place to protect the disclosure of Local Access's and Blitz's "Highly Confidential" designated litigation materials to Peerless.

105.   At the direction of KDW through Catherine James supervised by Henry Kelly, Peerless employees Scott Kell and Bob Sherman used, reviewed and analyzed millions of Local Access's "Highly Confidential" designated CDRs from the January 2018 Production to identify customers associated with individual phone numbers and to determine which telephone numbers had the highest volume of traffic.  This use was not permissible in or related to the litigation of Case III.

106.   KDW through Catherine James supervised by Henry Kelly actively participated in Peerless's use, review and analysis of the "Highly Confidential" January 2018 Production that Peerless was not authorized to have or use.

107.   At the direction of KDW through Catherine James supervised by Henry Kelly, Peerless employees Scott Kell and Bob Sherman used the information in Local Access's "Highly Confidential" designated CDRs from the January 2018 Production with Peerless's own records containing CPNI that was collected from telecommunications carriers and customers in the provision of telecommunications services, in an effort to identify and match customer names to the traffic and telephone numbers in the January 2018 Production.  This use was not permissible in or related to the litigation of Case III.

108.   At the direction of KDW through Catherine James supervised by Henry Kelly, Peerless employees Scott Kell and Bob Sherman used the information in Local Access's "Confidential" designated CDRs from the December 2017 Production with Peerless's own records containing CPNI that was collected from telecommunications carriers and customers in the provision of telecommunications services, in an effort to identify and match customer names to the traffic in the January 2018 Production.

109.    Peerless and Richard Knight used the CPNI contained in Peerless's own records, which it had received or obtained through its provision of telecommunication services, for purposes other than the provision of telecommunication services, including the furtherance of Peerless's own marketing efforts.

110.    Peerless and Richard Knight used the results of the analyses performed by Peerless employees Scott Kell and Bob Sherman on the January 2018 Production for business purposes unrelated to the prosecution or defense of Case III.

111.    Local Access designated the April 2018 Production "Highly Confidential" by including the words "Highly Confidential" in each of the filenames of the electronically produced sets of CDRs.

112.    Pursuant to the Protective Order, KDW, Henry Kelly and Catherine James were prohibited from disclosing the contents of the April 2018 Production to Peerless or any of its employees because it was designated as "Highly Confidential" by Local Access. Nonetheless, KDW through Henry Kelly, Catherine James, Bethany Pedersen and/or others, disclosed  the April 2018 Production designated as "Highly Confidential" to Peerless employee Scott Kell by delivering the portable hard drive containing the April 2018 Production to Mr. Kell. This use was not permissible in or related to the litigation of Case III.

113.    At the time he instructed Catherine James, Bethany Pedersen or others at KDW to deliver the hard drive containing the April 2018 Production designated as "Highly Confidential" directly to Peerless, Henry Kelly knew or had reason to know that the April 2018 Production was designated as "Highly Confidential."

114.    In April 2018, Local Access suspected that Peerless was using Local
Access's protected litigation materials for marketing purposes.

115.    KDW knew as early as April 11, 2018 that KDW attorneys had disclosed
the Highly Confidential January 2018 Production to Peerless.

116.    Despite such knowledge, KDW sent a misleading email on May 7, 2018 to
Local Access's counsel to try to get Local Access to re-designate the January 2018
Production as merely Confidential.

117.    Local Access designated the May 2018 Production "Highly Confidential."

118.    Pursuant to the Protective Order, KDW, Henry Kelly and Catherine James
were prohibited from disclosing the contents of the May 2018 Production to Peerless or
any of its employees because it was designated as "Highly Confidential" by Local
Access.

119.    The May 2018 Production contained Local Access's proprietary contracts
with five customers, whose identities were not available to the public or Local Access's
competitors with reasonable effort.

120.    KDW through Henry Kelly and/or Catherine James, and others, disclosed
some or all of the contents of the May 2018 Production designated as "Highly
Confidential" to Peerless.

121.    Within approximately one week of KDW, Henry Kelly and Catherine
James receiving the "Highly Confidential" May 2018 Production, Peerless contacted at
least one of the Local Access Customers identified in the May 2018 Production for the
purpose of marketing Peerless's services to that customer.  An email sent by Peerless
to market to one of the five customers from the May 2018 Production was the first time

25

Peerless had proactively marketed to that customer in approximately three years, and the email contained analysis relative to the same nature of services (outbound traffic) that was the subject of the customer's contract with Local Access.  This use of the proprietary information contained in the May 2018 Production was not permissible in or related to the litigation of Case III.

122.    Through its use of Blitz's and Local Access's proprietary information, derived from the discovery productions it acquired or obtained from KDW, Peerless was successful in its efforts to sell services to Local Access and Blitz customers in 2018 and beyond, including but not limited to Arkadin, Invoxio and Maxsip.  These efforts were only made possible by the use and disclosure of Blitz's and Local Access's proprietary information in violation of the Protective Order by KDW, Henry Kelly, Catherine James, Peerless and Richard Knight, as described above.  Such uses of the proprietary information for the discovery productions was not permissible in or related to the litigation of Case III.

123.    Peerless's successful marketing efforts in 2018 caused a reduction of customers, traffic, and revenue to Local Access and Blitz, causing them damage.

124.    On or about May 16, 2018, after repeated inquiries by Local Access's counsel, KDW through Catherine James supervised by Henry Kelly admitted that KDW had disclosed Local Access's "Highly Confidential" January 2018 Production to Peerless and that Peerless had used that Production.

125.    On or about May 25, 2018, after continued inquiries by Local Access's counsel, KDW through Henry Kelly admitted that Peerless had used information gleaned from the "Confidential" December 2017 Production to identify and contact

customers of Local Access and/or Blitz for commercial and/or competitive purposes, including marketing.

126.    Following this disclosure, Local Access filed motions for sanctions against both KDW and Peerless in Case III for the multiplicity of violations of the Protective Order.

127.    The primary purpose of the sanctions motions was to investigate the breadth of the violations of the Protective Order by Peerless and KDW as quickly as possible and to ensure that such violations stopped immediately, as Peerless was continuing to seek production of additional protected litigation materials in discovery.

128.    The sanctions motions were not separate lawsuits and did not include any claims for violation of the federal and state trade secrets acts or the Telecommunications Act at issue here.

129.    The sanctions motion against KDW sought disqualification of KDW from Case III, a ruling of contempt, leave to conduct discovery on the circumstances surrounding KDW's violations of the Protective Order, the setting of an evidentiary hearing, monetary sanctions (not damages that Plaintiffs would receive), and attorneys' fees and costs incurred in exposing and prosecuting the violations.

130.    The Peerless motion sought similar relief plus a striking of Peerless's pleadings.

131.    Neither motion requested an award of damages.

132.    Neither motion did or could invoke the TCA, or state or federal trade secret acts, as those statutes were not the subject of the complaint in Case III and could not be pleaded as separate actions in a sanctions motion.

133.   The motions for sanctions alleged that Peerless and KDW; through Kelly, James, Knight and others; used the December 2017 Production and the January 2018 Production in ways that were violative of the Protective Order in Case 3.

134.   The sanctions motions were not separate lawsuits and did not include any claims for violation of the federal and state trade secrets acts or the Telecommunications Act.

135.   In their responses to the sanctions motions, Peerless and KDW suggested that Peerless should pay Local Access and Blitz compensatory damages.

136.   Local Access expressed concern to the Court that Peerless would use any "sanctions discovery" to commit further violations and that a monetary penalty would not be an adequate deterrent.

137.   The Case III court entered an Order Governing Discovery (the "Discovery Order") which stayed the underlying breach of contract action so that the parties could engage in limited discovery as to the Protective Order violations.

138.   KDW and Peerless aggressively pursued discovery for more information on Local Access's customers, including copies of their contracts, and sought to issue subpoenas to Plaintiffs' customers and vendors, causing further harm to Plaintiffs' business relationships.

139.   Plaintiffs reminded the Court of the relief sought in the motions which did not include monetary damages, and clarified that if Plaintiffs were to seek damages for violations of trade secrets acts and the TCA, the proper vehicle for addressing the elements of those claims would be to file a separate lawsuit stating those independent causes of action.

140.   Plaintiffs expressly reserved the right to pursue damages in a separate lawsuit where they could assert all appropriate causes of actions, have a complaint and answer, and have the full scope of discovery and motions.

141.   The Court entered an order reflecting this clarification of what was at issue in the sanctions phase, documenting that Plaintiffs were not seeking damages in the sanctions proceeding and stated that if Plaintiffs decided to seek damages or other relief, "they will file a new lawsuit for that purpose."

142.   The order documented that Plaintiffs were not seeking damages in the sanctions proceeding and stated that if Plaintiffs decided to seek damages or other relief, "they will file a new lawsuit for that purpose."

143.   Peerless and KDW immediately sought clarification of that order, seeking a preemptive adjudication that res judicata would preclude future claims for damages, but the Court denied that motion.

144.   The sanctions proceedings were about the defendants' violation of a protective order, and not about the defendants' infringement on the Plaintiffs' trade secrets nor the defendants' violation of state and federal statutes.

145.   The sanctions motions were not separate lawsuits and did not include any claims for violation of the federal and state trade secrets acts or the Telecommunications Act.

146.   Neither motion did or could invoke the TCA, or state or federal trade secret acts, as those statutes were not the subject of the complaint in Case III and could not be pleaded as separate actions in a sanctions motion.

29

147.    The motions for sanctions did not seek sanctions against or damages from Rick Knight, individually.

148.    While the motions for sanctions were pending, Plaintiffs sought to include misuse of the April 2018 Production and May 2018 Production in the sanctions proceedings and Defendants argued against it, representing that the April 2018 Production and May 2018 Production were not disclosed to Peerless or misused by any Defendants.

149.    The Court accepted the representations of the Defendants and, as a result, prohibited Plaintiffs from including any misappropriation, disclosure or misuse of the April 2018 Production and May 2018 Production in the sanctions proceedings.

150.    Plaintiffs were foreclosed from doing discovery in the sanctions phase relative to the April 2018 Production and May 2018 Production because the Court accepted Defendants' arguments and representations in opposition to such discovery.

151.    Plaintiffs were foreclosed from seeking any recourse against Defendant in the sanctions phase relative to the April 2018 Production and May 2018 Production because the Court accepted Defendants' arguments and representations relative to those Productions.

152.    During the "Sanctions Phase" of Case III, Local Access and Blitz expressly announced their intention to seek the monetary damages arising from KDW's and Peerless's actions in a separate lawsuit that would properly plead and address KDW's and Peerless's actionable conduct, and the Court acknowledged the same in the Order attached hereto as **Exhibit 2**.

153.   Magistrate Judge Thomas Smith conducted a hearing on the KDW sanctions motion in March 2019.

154.   The focus of that hearing was precisely what was addressed in the motion for sanctions against KDW: the extent of KDW's violations of the Protective Order.

155.   Following the hearing, Magistrate Judge Smith issued his Report and Recommendation as to the KDW sanctions motion, finding that KDW had violated the Protective Order and recommending that Plaintiffs' attorneys' fees and costs incurred in exposing and prosecuting KDW's violations be paid by KDW.

156.   The District Court Judge accepted the factual findings in the R&R, but imposed greater penalties than Magistrate Judge Smith had recommended because "the Court [did] not believe the recommended sanctions go far enough to curb the offending conduct."

157.   The Court held that the conduct of the KDW attorneys was "unprofessional, unethical, and unbecoming of attorneys practicing not only in federal court, but any court."

158.   The focus of the sanctions phase was the misconduct that violated the Court's order and the harm to the judicial process – not the harm suffered by Plaintiffs as a result of that misconduct.

159.   In the Case III sanctions proceedings, there was no consideration of, nor adjudication of, claims under the trade secrets acts, claims under the TCA, or damages incurred by Plaintiffs.

160.   On January 15, 2020, Magistrate Judge Embry Kidd held oral argument on the motion for sanctions against Peerless.

161.    Magistrate Judge Kidd's subsequent Report & Recommendations recommended a finding of civil contempt and that Peerless pay costs of $99,887.00 that stemmed from its violations of the Court's order.

162.    The District Court Judge adopted and confirmed Magistrate Judge Kidd's Report and Recommendations, held Peerless in civil contempt for violating the Court's protective order, and ordered Peerless to Plaintiffs 99,887.00 in costs.

163.    The Magistrate Judge and the District Court Judge focused solely on Peerless's violation of the Court's protective order and the disruption of the judicial process that resulted.

164.    Plaintiffs did not assert in the motion, nor did the Court ever address, monetary damages that arose from Peerless's violations of the Court order.

165.    In the Court's order on the motion for sanctions against Peerless, the Court concluded that it was "foreclosed" from awarding damages resulting from Defendants' violative conduct as a sanction, based on the pendency of this separate action seeking those damages.

166.    Despite Peerless's and KDW's representations to the Court in Case III that Peerless had come into compliance with the Protective Order and that Peerless and KDW would take affirmative steps to prevent Peerless from marketing to and taking business from Plaintiffs' customers, Peerless continued to market to the customers Peerless identified and analyzed from the discovery productions and by using CPNI Peerless gathered in the provision of telecommunications services.  This use was not permissible in or related to the litigation of Case III.

167.    As described more fully herein, after the filing of the sanctions motions, Peerless, with KDW's aid, continued or resumed the misappropriation and dissemination of Plaintiffs' trade secrets.

168.    Continuing or new misappropriations occurred while the parties were litigating the sanctions motions, and even after the Court heard the sanctions motions.

169.    Defendants used Plaintiffs' trade secret protected information for Peerless's own marketing uses after the June 2018 sanctions motions were filed.

170.    Defendants used Plaintiffs' trade secret protected information for Peerless's own marketing uses after the March 2019 hearing on sanctions against KDW.

171.    Defendants used Plaintiffs' trade secret protected information for Peerless's own marketing uses after the January 2020 hearing on sanctions against Peerless.

172.    As a result of Defendants' misappropriation of Plaintiffs' trade secrets and Peerless's violation of the TCA, Peerless was successful in transferring telephone numbers from Blitz customers Peerless identified from the December 2017 Production and January 2018 Production, after discovery in the sanctions proceedings closed, including but not limited to Invoxio, DIDWW and Network IP.

173.    As a result of Defendants' misappropriation of Plaintiffs' trade secrets and Peerless's violation of the TCA, Peerless was successful in transferring telephone numbers of 8 or more Blitz customers from Plaintiffs to Peerless in April 2020 alone.

174.    By misappropriating Plaintiffs' trade secrets and using Peerless's own records that it collected in the provision of telecommunications services, Peerless was

able to market to and take telephone numbers from Plaintiffs' customers, including but not limited to Flyp, Teli, Linevox, IP Comm, Summit, Inphonex, Endstream, and Arkadin.

175.    Despite Defendants' repeated representations to Plaintiffs and the court in the sanctions proceedings, Peerless used for its own marketing purposes the protected information Peerless derived from the Highly Confidential records in the January 2018 Production, the April 2018 Production and the May 2018 Production.

176.    Despite Defendants' repeated representations to Plaintiffs and the court in the sanctions proceedings, that Peerless used only the December 2017 Production for marketing purposes, several of the Plaintiffs' customers that were targeted by Peerless for marketing were listed in the January 2018 Production, the April 2018 Production and the May 2018 Production, but were not listed in the December 2017 Production.

177.    Defendants' use of Plaintiffs' trade secrets after Plaintiffs moved for sanctions in Case III give rise to new operative facts that create new claims to relief.

178.    Defendants' use of Plaintiffs' trade secrets after Plaintiffs moved for sanctions in Case III could not have been raised in the motions for sanctions as they had not yet occurred.

179.    At the time Plaintiffs moved for sanctions in Case III, Plaintiffs had not yet incurred or discovered the harm that Defendants caused by using Plaintiffs' trade secrets after the filing of those motions.

180.    In April 2020, Blitz entered into an Asset Purchase Agreement to sell certain customer accounts to Valor Invest, Ltd. for $14,946,000 (Fourteen Million, Nine Hundred Forty-Six Thousand Dollars) ("the Valor APA").

181.    Subsequent to entering into the Valor APA, but before the parties went to closing, Plaintiffs became aware for the first time that Blitz Customers from the proprietary customer list derived from Plaintiffs' discovery productions were  porting numbers to Peerless and its affiliates or subsidiaries, including customers that were being sold to Valor.  This was Plaintiffs' first indication that Peerless was continuing to use Plaintiffs' proprietary information to market to Plaintiffs' customers.

182.    Since the filing of the motions in Case III seeking sanctions against Defendants, Defendants engaged in separate and distinct acts of misappropriation of Plaintiffs' trade secrets by disseminating and using Plaintiffs' trade secrets.  During that time period, Peerless and its employees, including but not limited to Richard Knight, marketed to Plaintiffs' customers and customers' customers by using information derived from the Productions and from records Peerless gathered for the provision of telecommunications services.  KDW, Henry Kelly and Catherine James assisted Peerless and Richard Knight in these continuing efforts to market to Plaintiffs' customers and customers' customers by actively concealing Peerless's marketing efforts and by providing advice to Peerless on the marketing process.  None of these acts were permissible in or related to the litigation of Case III.

183.    Blitz was obligated to disclose to Valor that Peerless was successfully marketing to customers that were part of the Valor APA block of assets, as it was a material fact that impacted the value of the assets Blitz was selling.

184.    Upon learning that Peerless was actively marketing to Blitz's customers that were identifiable from the discovery productions, and that Peerless was successfully obtaining business from those customers, Valor terminated the Valor APA.

Valor informed Blitz that the sole and exclusive reason for terminating the Valor APA was that Peerless was continuing to take Blitz's customers' business.

185.   Blitz then entered into an Asset Purchase Agreement with HFA Holdings, LLC for the sale of the customer accounts that were the subject of the Valor APA.  The contract with HFA Holdings, LLC was for $8,500,000 (Eight Million, Five Hundred Thousand Dollars), representing a loss of $6,446,000 (Six Million, Four Hundred Forty-Six Thousand Dollars) for Blitz between the two transactions.  The sole reason for the loss was that the value of the customer accounts was diminished by Peerless's active marketing to Blitz's customers from the discovery productions and CPNI gathered by Peerless in the provision of telecommunications services.

### COUNT I - Defend Trade Secrets Act
### (Blitz v. KDW, Henry Kelly and Catherine James)

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as though fully restated herein, and further state:

186.   This is an action for remedies under the Defend Trade Secrets Act, Title 18, chapter 90 of the United States Code ("the DTSA").

187.   The information contained in the Productions contained proprietary customer information owned by Blitz, including but not limited to the names of Blitz's and Local Access's customers, the names of Blitz's customers' customers, telephone numbers that could be used to identify Blitz's customers and its customers' customers, routing information, traffic information, DID volumes and proprietary coding information. Blitz derived independent economic value from the secrecy of this information in that the information could be used by competitors to analyze the volume of DIDs, the minutes of use, the growth or reduction in traffic, the routing information, and other information that

would allow competitors to identify which of Blitz's customers to target, what services to offer those customers, and where it would be advantageous to provide credits for certain services in order to promote sales of other lucrative services. The value of the secrecy of this information is evinced, in part, by the losses that Blitz incurred once Peerless obtained and used Blitz's proprietary information to market to Blitz's customers.

188.    The CDRs contained in the Productions also contain proprietary coding information that Plaintiffs developed for ease of sorting and managing the data contained within the CDRs, as well as customized coding that Plaintiffs developed to address specific requests of their customers. The creation and use of these codes, and the codes themselves, are not industry practice and standard, and are unique developments that Plaintiffs use to analyze their own status with customers and financial standing, as well as to market to their existing and potential customers. Plaintiffs' willingness and ability to provide customized coding for customers provide Plaintiffs with a marketing advantage over larger carriers and aggregators, thereby providing Plaintiffs with independent economic value through the secrecy of that information.

189.    The nature of the proprietary information at issue is set forth in more detail in paragraphs 44 through 72, above.

190.    This proprietary information constitutes financial and business information that Blitz has taken reasonable measures to keep secret.

191.    This proprietary information derives independent economic value to Blitz in that it is not generally known to Blitz's competitors, is not readily ascertainable by

their competitors by proper means, and Blitz's competitors could obtain economic value from the disclosure or use of the information. The economic value that Blitz derives is evinced, in part, by the losses Blitz suffered as a direct result of Peerless's acquisition and use of the proprietary information contained in the Productions, including the loss of business and the loss of resale value of Blitz's accounts.

192. Because Blitz makes significant efforts to maintain the secrecy of the described proprietary information, and derives economic benefit from the maintenance of the secrecy of the information, this proprietary information constitutes trade secrets under the DTSA.

193. Blitz's trade secrets were, at all times material hereto, used in interstate commerce.

194. Local Access, who lawfully had Blitz's trade secrets and who was required to maintain its secrecy, refused to disclose the proprietary information to KDW, Henry Kelly and Catherine James until a court of competent jurisdiction ordered Local Access to produce the proprietary information within the terms of a valid Protective Order.

195. Local Access designated the December 2017 Production as Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for KDW, Henry Kelly and Catherine James to maintain the secrecy of Blitz's trade secrets and limit the use of Blitz's trade secrets.

196. Local Access designated the January 2018 Production and the April 2018 Production as Highly Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for KDW,

38

Henry Kelly and Catherine James to maintain the secrecy of Blitz's trade secrets and limit the use of Blitz's trade secrets.

197.    Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James provided Blitz's proprietary information to Peerless and its employees (including but not limited to Bob Sherman, Scott Kell, John Barnicle and Richard Knight) in direct violation of the obligation of secrecy and the limitation of use that KDW, Henry Kelly and Catherine James all knew to exist relative to Confidential and Highly Confidential designated information.  This disclosure was not permissible in or related to the litigation of Case III.

198.    Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James used Blitz's proprietary information in direct violation of the limitations of use that KDW, Henry Kelly and Catherine James all knew to exist relative to Confidential and Highly Confidential designated information.  This use was not permissible in or related to the litigation of Case III.

199.    At the time that KDW, Henry Kelly and Catherine James disclosed and used Blitz's protected trade secrets, they each knew or had reason to know that the information was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and limiting the use of the trade secrets.

200.    The disclosure and use of Blitz's trade secrets by KDW, Henry Kelly and Catherine James constituted one or more misappropriations of the trade secrets under the DTSA.

201.    Even while and after the parties litigated the "Sanctions Phase" in Case III, KDW, Henry Kelly and Catherine James conspired with Peerless to conceal and assist

Peerless's marketing to Blitz's customers and customers' customers by allowing Peerless to use the proprietary information contained within the Productions and by failing to implement the safeguards against such use that they represented would be put in place. These actions were not permissible in or related to the litigation of Case III.

202. Even while and after the parties litigated the "Sanctions Phase" in Case III, KDW, Henry Kelly and Catherine James conspired with Peerless to conceal and assist Peerless's efforts to steal Blitz's customers and customers' customers, and to convert their business for the use and benefit of Peerless and its affiliates and subsidiaries, failing to implement the safeguards against such use that they represented would be put in place. These actions were not permissible in or related to the litigation of Case III.

203. Each instance of marketing to Blitz's customers and customers' customers using Blitz's proprietary information constituted a separate and independent misappropriation of Blitz's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

204. Each instance of entering into a contract with Blitz's customers and customers' customers as the result of marketing efforts that used Blitz's proprietary information constituted a separate and independent misappropriation of Blitz's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

205. Each instance of porting numbers that belonged to Blitz's customers and customers' customers as the result of marketing efforts that used Blitz's proprietary information constituted a separate and independent misappropriation of Blitz's trade

secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

206.    As a direct and proximate result of the use and disclosure of Blitz's trade secrets by KDW, Henry Kelly and Catherine James; Blitz has suffered actual damages of the following nature:

a.    Peerless and its Executive Vice President of Sales and Marketing, Richard Knight, used the trade secrets it received from KDW, Henry Kelly and Catherine James to steal Blitz's customers, Blitz's customers' customers, Blitz's traffic, and/or Blitz's customers' traffic; all of which resulted in lost revenue for Blitz.

b.    Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, worked with KDW and Catherine James to analyze Blitz's trade secrets for more effective marketing to Blitz's customers and Blitz's customers' customers, resulting in the loss of revenue for Blitz.

c.    KDW, Peerless and their respective employees have used Blitz's trade secrets, which KDW, Henry Kelly and Catherine James used and disclosed to Peerless, to solicit Blitz's customers and to involve or try to involve those customers in litigation, so as to drive customers and traffic away from Blitz, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Blitz.

d.    When Blitz entered into an Asset Purchase Agreement that would have sold Blitz assets (including customer contracts) for nearly $15 Million, the purchaser terminated the agreement for the sole reason that Peerless was

41

using the trade secrets it acquired from KDW, Henry Kelly and Catherine

James to market to customers whose contracts were part of the sale.

207.    In addition, KDW has been unjustly enriched by its disclosure and use of

Blitz's trade secrets in that the violations of the protective order by KDW, Henry Kelly,

Catherine James, Peerless and Richard Knight have been the subject of sanctions

motions in Case III that has been on-going for more than two years, all of which time

KDW has been compensated by Peerless for representation in those proceedings.

Absent the improper disclosure and use of Blitz's and Local Access's trade secrets and

Defendants' active concealment of the misconduct described herein, Case III would not

have been stayed and KDW would not have received the fees and/or compensation

from Peerless that it has received since June 2018 relative to the litigation of the

sanctions issues.  The fees and/or compensation, by which KDW has been unjustly

enriched, should be disgorged and awarded to Blitz pursuant to 18 USC

§1836(3)(B)(i)(II).  KDW, Henry Kelly and Catherine James misappropriated Blitz's trade

secrets willfully and maliciously, such that exemplary damages are appropriate under 18

U.S.C. §1836(3)(C).

208.    KDW, Henry Kelly and Catherine James misappropriated Blitz's trade

secrets willfully and maliciously, such that Blitz is entitled to an award of its reasonable

attorneys' fees upon prevailing in this action, pursuant to 18 U.S.C. §1836(3)(D).

WHEREFORE, BLITZ TELECOM CONSULTING, LLC demands entry of a

judgment awarding the following:

a. All actual losses incurred by Blitz as a result of the misappropriation of Blitz's trade secrets by KDW, Henry Kelly and Catherine James, with joint and several liability for such damages;

b. All amounts by which KDW, Henry Kelly and Catherine James have been unjustly enriched as a result of their misappropriations of Blitz's trade secrets, and disgorgement of same from those defendants;

c. Exemplary damages in an amount not more than two times the amounts awarded under subparagraphs (a) and (b) above;

d. All reasonable attorneys' fees and costs incurred by Blitz in this litigation; and

e. All other relief this Court deems just and equitable under the circumstances.

## COUNT II - Defend Trade Secrets Act –
### (Local Access v. KDW, Henry Kelly and Catherine James)

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as though fully restated herein, and further state:

209.    This is an action for remedies under the Defend Trade Secrets Act, Title 18, chapter 90 of the United States Code ("the DTSA").

210.    The information contained in the Productions contained proprietary customer information owned by Local Access, including but not limited to the names of Local Access's customers, the names of Local Access's customers' customers, telephone numbers that could be used to identify Local Access's customers and its customers' customers, routing information, traffic information, DID volumes and proprietary coding information.  Local Access derived independent economic value from the secrecy of this information in that the information could be used by competitors to analyze the volume of DIDs, the minutes of use, the growth or reduction in traffic, the

routing information, and other information that would allow competitors to identify which customers and customers' customers of Local Access to target, what services to offer those customers, and where it would be advantageous to provide credits for certain services in order to promote sales of other lucrative services.  The value of the secrecy of this information is evinced, in part, by the losses that Local Access incurred once Peerless obtained and used Local Access's proprietary information to market to Local Access's customers.

211.   The CDRs contained in the Productions also contain proprietary coding information that Plaintiffs developed for ease of sorting and managing the data contained within the CDRs, as well as customized coding that Plaintiffs developed to address specific requests of their customers.  The creation and use of these codes, and the codes themselves, are not industry practice and standard, and are unique developments that Plaintiffs use to analyze their own status with customers and financial standing, as well as to market to their existing and potential customers. Plaintiffs' willingness and ability to provide customized coding for customers provide Plaintiffs with a marketing advantage over larger carriers and aggregators, thereby providing Plaintiffs with independent economic value through the secrecy of that information.

212.   The nature of the proprietary information at issue is set forth in more detail in paragraphs 44 through 72, above.

213.   The information contained in the May 2018 Production also contained confidential contracts between Local Access and it customers.  Within those contracts was trade secret information, including but not limited to customer identifications, types

of traffic provided for those customers, pricing information, expected and minimum traffic levels, contract durations and other contract terms that would provide Local Access's customers with the ability to target Local Access's customers and to analyze the services, pricing and terms to offer those customers so as to undercut Local Access and take Local Access's customers.

214.    This proprietary information constitutes financial and business information that Local Access has taken reasonable measures to keep secret.

215.    This proprietary information derives independent economic value to Local Access in that it is not generally known to Local Access's competitors, is not readily ascertainable by Local Access's competitors by proper means, and Local Access's competitors could obtain economic value from the disclosure or use of the information. The economic value that Local Access derives is evinced, in part, by the losses Local Access suffered as a direct result of Peerless's acquisition and use of the proprietary information contained in the Productions.

216.    Because Local Access makes significant efforts to maintain the secrecy of the described proprietary information, and derives economic benefit from the maintenance of the secrecy of the information, this proprietary information constitutes trade secrets under the DTSA.

217.    Local Access's trade secrets were, at all times material hereto, used in interstate commerce.

218.    Local Access refused to disclose the proprietary information to KDW, Henry Kelly and Catherine James until a court of competent jurisdiction ordered Local

Access to produce the proprietary information within the terms of a valid Protective Order.

219.   Local Access designated the December 2017 Production as Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for KDW, Henry Kelly and Catherine James to maintain the secrecy of Local Access's trade secrets and limit the use of Local Access's trade secrets.

220.   Local Access designated the January 2018 Production, the April 2018 Production and the May 2018 Production as Highly Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for KDW, Henry Kelly and Catherine James to maintain the secrecy of Local Access's trade secrets and limit the use of Local Access's trade secrets.

221.   Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James provided Local Access's trade secrets to Peerless and its employees (including but not limited to Bob Sherman, Scott Kell, John Barnicle and Richard Knight) in direct violation of the obligation of secrecy and the limitation of use that KDW, Henry Kelly and Catherine James all knew to exist relative to Confidential and Highly Confidential designated information.  This disclosure was not permissible in or related to the litigation of Case III.

222.   Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James used Local Access's trade secrets in direct violation of the limitations of use that KDW, Henry Kelly and Catherine James all knew to exist relative to

Confidential and Highly Confidential designated information.  This use was not permissible in or related to the litigation of Case III.

223.    At the time that KDW, Henry Kelly and Catherine James disclosed and used Local Access's protected trade secrets, they each knew or had reason to know that the information was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and limiting the use of the trade secrets.

224.    The disclosure and use of Local Access's trade secrets by KDW, Henry Kelly and Catherine James constituted one or more misappropriations of the trade secrets under the DTSA.

225.    Even while and after the parties litigated the "Sanctions Phase" in Case III, KDW, Henry Kelly and Catherine James conspired with Peerless to conceal and assist Peerless's marketing to Local Access's customers and customers' customers by allowing Peerless to use the proprietary information contained within the Productions and by failing to implement the safeguards against such use that they represented would be put in place.  These actions were not permissible in or related to the litigation of Case III.

226.    Even while and after the parties litigated the "Sanctions Phase" in Case III, KDW, Henry Kelly and Catherine James conspired with Peerless to conceal and assist Peerless's efforts to steal Local Access's customers and customers' customers, and to convert their business for the use and benefit of Peerless and its affiliates and subsidiaries, failing to implement the safeguards against such use that they represented would be put in place.  These actions were not permissible in or related to the litigation of Case III.

227.   Each instance of marketing to Local Access's customers and customers' customers using Blitz's proprietary information constituted a separate and independent misappropriation of Local Access's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

228.   Each instance of entering into a contract with Local Access's customers and customers' customers as the result of marketing efforts that used Local Access's proprietary information constituted a separate and independent misappropriation of Local Access's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

229.   Each instance of porting numbers that belonged to Local Access's customers and customers' customers as the result of marketing efforts that used Local Access's proprietary information constituted a separate and independent misappropriation of Local Access's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

230.   As a direct and proximate result of the use and disclosure of Local Access's trade secrets by KDW, Henry Kelly and Catherine James, Local Access has suffered actual damages of the following nature:

   a. Peerless and its Executive Vice President of Sales and Marketing, Richard Knight, used the trade secrets it received from KDW, Henry Kelly and Catherine James to steal Local Access's customers, Local Access's customers' customers, Local Access's traffic, and/or Local

48

Access's customers' traffic; all of which resulted in lost revenue for Local Access.

b. Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, worked with KDW and Catherine James to analyze Local Access's trade secrets for more effective marketing to Local Access's customers and Local Access's customers' customers, resulting in the loss of revenue for Local Access.

c. KDW, Peerless and their respective employees have used Local Access's trade secrets, which KDW, Henry Kelly and Catherine James used and disclosed to Peerless, to solicit Local Access's customers and to involve or try to involve those customers in litigation, so as to drive customers and traffic away from Local Access, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Local Access.

d. Peerless used the trade secrets it received from KDW, Henry Kelly and Catherine James, and Peerless's misconstruction of that information, to terminate its contract with Local Access wrongfully and prematurely, resulting in significant monetary loss to Local Access. But for KDW, Henry Kelly and Catherine James providing Local Access's trade secrets to Peerless improperly, Peerless would not have terminated the contract prematurely.

e. The stay of Case III, which has lasted for more than two years, would not have occurred but for the misappropriation of Local Access's and

Blitz's trade secrets by KDW, Henry Kelly and Catherine James. That stay has resulted in the expiration of most, and perhaps all, of the remaining period that Local Access had on its contract with Peerless. Thus, Local Access has lost the benefit of its contract with Peerless as a result of the misappropriations by KDW, Henry Kelly and Catherine James.

    f.   The stay of Case III for prosecution of the sanctions arising from KDW's and Peerless's violations of the Protective Order have caused Local Access to incur attorneys' fees and litigation expenses that it would not have otherwise incurred. While some of these fees and costs may be recovered in the sanctions phase of Case III, any fees and costs that are not recovered in that proceeding would be recoverable in this action as consequential damages.

231.   In addition, KDW has been unjustly enriched by its disclosure and use of Local Access's trade secrets in that the violations of the protective order by KDW, Henry Kelly, Catherine James, Peerless and Richard Knight have been the subject of sanctions motions in Case III that has been on-going for more than three years, all of which time KDW has been compensated by Peerless for representation in those proceedings. Absent the improper disclosure and use of Local Access's trade secrets, Case III would not have been stayed and KDW would not have received the fees and/or compensation from Peerless that it has received since June 2018 relative to the litigation of the sanctions issues. The fees and/or compensation, by which KDW has been unjustly enriched, should be disgorged and awarded to Local Access pursuant to

18 USC §1836(3)(B)(i)(II). KDW, Henry Kelly and Catherine James misappropriated Local Access's trade secrets willfully and maliciously, such that exemplary damages are appropriate under 18 U.S.C. §1836(3)(C).

232. KDW, Henry Kelly and Catherine James misappropriated Local Access's trade secrets willfully and maliciously, such that Local Access is entitled to an award of its reasonable attorneys' fees upon prevailing in this action, pursuant to 18 U.S.C. §1836(3)(D).

WHEREFORE, LOCAL ACCESS, LLC demands entry of a judgment awarding the following:

a. All actual losses and expenses incurred by Local Access as a result of the misappropriation of Local Access's trade secrets by KDW, Henry Kelly and Catherine James, with joint and several liability for such damages;

b. All amounts by which KDW, Henry Kelly and Catherine James have been unjustly enriched as a result of their misappropriations of Local Access's trade secrets, and disgorgement of same from those defendants;

c. Exemplary damages in an amount not more than two times the amounts awarded under subparagraphs (a) and (b) above;

d. All reasonable attorneys' fees and costs incurred by Local Access in this litigation; and

e. All other relief this Court deems just and equitable under the circumstances.

## COUNT III - Defend Trade Secrets Act
### (Blitz v. Peerless and Richard Knight)

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as though fully restated herein, and further state:

233.    This is an action for remedies under the Defend Trade Secrets Act, Title 18, chapter 90 of the United States Code ("the DTSA").

234.    The information contained in the Productions contained proprietary customer information owned by Blitz, including but not limited to the names of Blitz's customers, the names of Blitz's customers' customers, telephone numbers that could be used to identify Blitz's customers and their customers' customers, routing information, traffic information, DID volume and proprietary coding information.  Blitz derived independent economic value from the secrecy of this information in that the information could be used by competitors to analyze the volume of DIDs, the minutes of use, the growth or reduction in traffic, the routing information, and other information that would allow competitors to identify which of Blitz's customers to target, what services to offer those customers, and where it would be advantageous to provide credits for certain services in order to promote sales of other lucrative services.  The value of the secrecy of this information is evinced, in part, by the losses that Blitz incurred once Peerless obtained and used Blitz's proprietary information to market to Blitz's customers.

235.    The CDRs contained in the Productions also contain proprietary coding information that Plaintiffs developed for ease of sorting and managing the data contained within the CDRs, as well as customized coding that Plaintiffs developed to address specific requests of their customers.  The creation and use of these customized codes, and the codes themselves, are not industry practice and standard, and are unique developments that Plaintiffs use to market to their existing and potential customers.  Plaintiffs' willingness and ability to provide customized coding for customers provide Plaintiffs with a marketing advantage over larger carriers and aggregators,

52

thereby providing Plaintiffs with independent economic value through the secrecy of that information.

236.    The nature of the proprietary information at issue is set forth in more detail in paragraphs 44 through 72, above.

237.    The proprietary information contained in the Productions constitutes financial and business information that Blitz has taken reasonable measures to keep secret.

238.    This proprietary information derives independent economic value to Blitz in that it is not generally known to Blitz's competitors, is not readily ascertainable by Blitz's competitors by proper means, and Blitz's competitors could obtain economic value from the disclosure or use of the information.  The economic value that Blitz derives is evinced, in part, by the losses Blitz suffered as a direct result of Peerless's acquisition and use of the proprietary information contained in the Productions, including the loss of business and the loss of resale value of Blitz's accounts.

239.    Because Blitz makes significant efforts to maintain the secrecy of the described proprietary information, and derives economic benefit from the maintenance of the secrecy of the information, this proprietary information constitutes trade secrets under the DTSA.

240.    Blitz's trade secrets were, at all times material hereto, used in interstate commerce.

241.    Local Access refused to disclose the proprietary information to Peerless, its employees or its counsel until a court of competent jurisdiction ordered Local Access to produce the proprietary information within the terms of a valid Protective Order.

242.   Local Access, who lawfully had Blitz's trade secrets and who was required to maintain its secrecy,  designated the December 2017 Production as Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for Peerless and its employees, including but not limited to Richard Knight, to maintain the secrecy of Blitz's trade secrets and limit the use of Blitz's trade secrets.

243.   Local Access designated the January 2018 Production and the April 2018 Production as Highly Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order would preclude Peerless and its employees from obtaining Blitz's trade secrets from Peerless's counsel.

244.   Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James, Peerless's agents and representatives, provided Blitz's proprietary information to Peerless and its employees (including but not limited to Bob Sherman, Scott Kell, John Barnicle and Richard Knight) in direct violation of the obligation of secrecy and the limitation of use that KDW, Henry Kelly and Catherine James all knew to exist relative to Confidential and Highly Confidential designated information. This disclosure was not permissible in or related to the litigation of Case III.

245.   At the time they acquired Blitz's trade secrets that had been designated as Highly Confidential, Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, knew or had reason to know that the Protective Order precluded them from acquiring those trade secrets.  Thus, Peerless and its employees knew or had reason to know that they were acquiring Blitz's trade secrets by improper means.

246.    Upon acquiring Blitz's trade secrets, Peerless and its employees, including but not limited to Bob Sherman and Scott Kell, used the information in direct violation of the limitations of use that Peerless and its employees knew or had reason to know were in place under the Protective Order.  This use was not permissible in or related to the litigation of Case III.

247.    Peerless and its employees, including Bob Sherman and Scott Kell, worked in conjunction with KDW and Catherine James to analyze Blitz's trade secrets, when all of them knew or had reason to know that Peerless and its employees should not see or be in possession of those trade secrets.  This use was not permissible in or related to the litigation of Case III.

248.    Upon acquiring Blitz's trade secrets from KDW and Catherine James, Peerless and Richard Knight used those trade secrets to market to Blitz's customers and customers' customers.  This use was not permissible in or related to the litigation of Case III.

249.    Peerless and Richard Knight worked in conjunction with KDW and Catherine James to analyze Blitz's trade secrets and to use those trade secrets for illegal and improper means.  This use was not permissible in or related to the litigation of Case III.

250.    Richard Knight, as Executive Vice President of Sales and Marketing for Peerless, and in furtherance of his personal pecuniary interests, further disclosed Blitz's trade secrets to other Peerless employees, including but not limited to Brian Brabson, Margaret McNerney and Jeff Davis.  This disclosure was not permissible in or related to the litigation of Case III.

251.    At the time that Richard Knight disclosed Blitz's trade secrets to other Peerless employees, he knew or had reason to know that he owed a duty to maintain the secrecy of the trade secrets and to limit their use.

252.    The disclosure and use of Blitz's trade secrets by Peerless and Richard Knight constituted one or more misappropriations of the trade secrets under the DTSA.

253.    Even while and after the parties litigated the "Sanctions Phase" in Case III, Peerless marketed to Blitz's customers and customers' customers by using the proprietary information contained within the Productions.  This use was not permissible in or related to the litigation of Case III.

254.    Even while and after the parties litigated the "Sanctions Phase" in Case III, Peerless stole Blitz's customers and customers' customers, and to convert their business for the use and benefit of Peerless and its affiliates and subsidiaries, by using the proprietary information contained within the Productions.  This use was not permissible in or related to the litigation of Case III.

255.    Each instance of marketing to Blitz's customers and customers' customers using Blitz's proprietary information constituted a separate and independent misappropriation of Blitz's trade secrets by Peerless and Richard Knight.

256.    Each instance of entering into a contract with Blitz's customers and customers' customers as the result of marketing efforts that used Blitz's proprietary information constituted a separate and independent misappropriation of Blitz's trade secrets by Peerless and Richard Knight.

257.    Each instance of porting numbers that belonged to Blitz's customers and customers' customers as the result of marketing efforts that used Blitz's proprietary

information constituted a separate and independent misappropriation of Blitz's trade secrets by Peerless and Richard Knight.

258.    As a direct and proximate result of the use and disclosure of Blitz's trade secrets by Peerless and Richard Knight, Blitz has suffered actual damages of the following nature:

a.   Peerless and Richard Knight used the trade secrets to steal Blitz's customers, Blitz's customers' customers, Blitz's traffic, and Blitz's customers' traffic; all of which resulted in lost revenue for Blitz.

b.   Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, worked with KDW and Catherine James to analyze Blitz's trade secrets for more effective marketing to Blitz's customers and Blitz's customers' customers, resulting in the loss of revenue for Blitz.

c.   Peerless and Richard Knight used Blitz's trade secrets to solicit Blitz's customers and to involve or try to involve those customers in litigation, so as to drive customers and traffic away from Blitz, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Blitz.

d.   When Blitz entered into the Valor APA that would have sold Blitz assets (including customer contracts) for nearly $15 Million, the purchaser terminated the agreement for the sole reason that Peerless and Richard Knight were using Blitz's trade secrets to market to customers whose contracts were part of the sale.

259.   In addition, Peerless has been unjustly enriched by its and Richard Knight's disclosure and use of Blitz's trade secrets in that Peerless has received additional customers, traffic and revenue that it would not have received but for the misappropriation of Blitz's and Local Access's trade secrets.  The additional revenue that Peerless has received as the result of its and Richard Knight's misappropriations should be disgorged and awarded to Blitz pursuant to 18 USC §1836(3)(B)(i)(II).

260.   Richard Knight has been unjustly enriched by his and Peerless's disclosure and use of Blitz's trade secrets in that he has received compensation, performance bonuses, dividends, increases in stock value, and other pecuniary gain as a result of the traffic and revenue that Peerless obtained from using Blitz's trade secrets.  The additional revenue that Richard Knight has received as the result of his and Peerless's misappropriations should be disgorged and awarded to Blitz pursuant to 18 USC §1836(3)(B)(i)(II).

261.   Peerless and Richard Knight misappropriated Blitz's trade secrets willfully and maliciously, such that exemplary damages are appropriate under 18 U.S.C. §1836(3)(C).

262.   Peerless and Richard Knight misappropriated Blitz's and Local Access's trade secrets willfully and maliciously, such that Blitz is entitled to an award of its reasonable attorneys' fees upon prevailing in this action, pursuant to 18 U.S.C. §1836(3)(D).

WHEREFORE, BLITZ TELECOM CONSULTING, LLC demands entry of a judgment awarding the following:

a. All actual losses incurred by Blitz as a result of the misappropriation of Blitz's trade secrets by Peerless and Richard Knight, with joint and several liability for such damages;

b. All amounts by which Peerless and Richard Knight have been unjustly enriched as a result of their misappropriations of Blitz's trade secrets, and disgorgement of same from those defendants;

c. Exemplary damages in an amount not more than two times the amounts awarded under subparagraphs (a) and (b) above;

d. All reasonable attorneys' fees and costs incurred by Blitz in this litigation; and

e. All other relief this Court deems just and equitable under the circumstances.

<u>COUNT IV - Defend Trade Secrets Act</u>
**(Local Access v. Peerless and Richard Knight)**

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as though fully restated herein, and further state:

263.    This is an action for remedies under the Defend Trade Secrets Act, Title 18, chapter 90 of the United States Code ("the DTSA").

264.    The information contained in the Productions contained proprietary customer information owned by Local Access, including but not limited to the names of Local Access's customers, the names of Local Access's customers' customers, telephone numbers that could be used to identify Local Access's customers and its customers' customers, DID volumes, routing information, traffic information and proprietary coding information.

265.    Local Access derived independent economic value from the secrecy of this information in that the information could be used by competitors to analyze the

volume of DIDs, the minutes of use, the growth or reduction in traffic, the routing information, and other information that would allow competitors to identify which of Local Access's customers to target, what services to offer those customers, and where it would be advantageous to provide credits for certain services in order to promote sales of other lucrative services.  The value of the secrecy of this information is evinced, in part, by the losses that Local Access incurred once Peerless obtained and used Local Access's proprietary information to market to Local Access's customers.

266.    The CDRs contained in the Productions also contain proprietary coding information that Plaintiffs developed for ease of sorting and managing the data contained within the CDRs, as well as customized coding that Plaintiffs developed to address specific requests of their customers.  The creation and use of these customized codes, and the codes themselves, are not industry practice and standard, and are unique developments that Plaintiffs use to market to their existing and potential customers.  Plaintiffs' willingness and ability to provide customized coding for customers provide Plaintiffs with a marketing advantage over larger carriers and aggregators, thereby providing Plaintiffs with independent economic value through the secrecy of that information.

267.    The nature of the proprietary information at issue is set forth in more detail in paragraphs 44 through 72, above.

268.    The CDRs also contained codes that are specific to proprietary processes for routing traffic, which if mined and understood by Local Access's competitors, could result in the development of competing processes and programs by competing carriers.

269.    The information contained in the May 2018 Production also contained confidential contracts between Local Access and it customers.  Within those contracts was trade secret information, including but not limited to customer identifications, types of traffic provided for those customers, pricing information, expected and minimum traffic levels, contract durations and other contract terms that would provide Local Access's customers with the ability to target Local Access's customers and to analyze the services, pricing and terms to offer those customers so as to undercut Local Access and take Local Access's customers.

270.    The proprietary information Contained in the Productions constitutes financial and business information that Local Access has taken reasonable measures to keep secret.

271.    This proprietary information derives independent economic value to Local Access in that it is not generally known to Local Access's competitors, is not readily ascertainable by Local Access's competitors by proper means, and Local Access's competitors could obtain economic value from the disclosure or use of the information. The economic value that Local Access derives is evinced, in part, by the losses Local Access suffered as a direct result of Peerless's acquisition and use of the proprietary information contained in the Productions, including the loss of business and the loss of resale value of Local Access's accounts.

272.    Because Local Access makes significant efforts to maintain the secrecy of the described proprietary information, and derives economic benefit from the maintenance of the secrecy of the information, this proprietary information constitutes trade secrets under the DTSA.

273.    Local Access's trade secrets were, at all times material hereto, used in interstate commerce.

274.    Local Access refused to disclose the proprietary information to Peerless, its employees or its counsel until a court of competent jurisdiction ordered Local Access to produce the proprietary information within the terms of a valid Protective Order.

275.    Local Access designated the December 2017 Production as Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for Peerless and its employees, including but not limited to Richard Knight, to maintain the secrecy of Local Access's trade secrets and limit the use of Local Access's trade secrets.

276.    Local Access designated the January 2018 Production, the April 2018 Production and the May 2018 Production as Highly Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order would preclude Peerless and its employees from obtaining Local Access's trade secrets from Peerless's counsel.

277.    Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James, Peerless's agents and representatives, provided Local Access's proprietary information to Peerless and its employees (including but not limited to Bob Sherman, Scott Kell, John Barnicle and Richard Knight) in direct violation of the obligation of secrecy and the limitation of use that KDW, Henry Kelly and Catherine James all knew to exist relative to Confidential and Highly Confidential designated information. This dissemination of Local Access's proprietary information was not permissible in or related to the litigation of Case III

278.   At the time they acquired Local Access's trade secrets that had been designated as Highly Confidential, Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, knew or had reason to know that the Protective Order precluded them from acquiring those trade secrets.  Thus, Peerless and its employees knew or had reason to know that they were acquiring Local Access's trade secrets by improper means.

279.   Upon acquiring Local Access's trade secrets, Peerless and its employees, including Bob Sherman and Scott Kell, used the information in direct violation of the limitations of use that Peerless and its employees knew or had reason to know were in place under the Protective Order.  This use was not permissible in or related to the litigation of Case III.

280.   Peerless and its employees, including Bob Sherman and Scott Kell, worked in conjunction with KDW and Catherine James to analyze Local Access's trade secrets, when all of them knew or had reason to know that Peerless and its employees should not see or be in possession of those trade secrets.  This use was not permissible in or related to the litigation of Case III.

281.   Upon acquiring Local Access's trade secrets from KDW and Catherine James, Peerless and Richard Knight used those trade secrets to market to Local Access's customers and customers' customers.  This use was not permissible in or related to the litigation of Case III.

282.   Peerless and Richard Knight worked in conjunction with KDW and Catherine James to analyze Local Access's trade secrets and to use those trade secrets for illegal and improper means.

283.    Richard Knight, as Executive Vice President of Sales and Marketing for Peerless, and in furtherance of his personal pecuniary interests, further disclosed Local Access's trade secrets to other Peerless employees, including but not limited to Brian Brabson, Margaret McNerney and Jeff Davis.  This disclosure was not permissible in or related to the litigation of Case III.

284.    At the time that Richard Knight disclosed Local Access's trade secrets to other Peerless employees, he knew or had reason to know that he owed a duty to maintain the secrecy of the trade secrets and to limit their use.

285.    The disclosure and use of Local Access's trade secrets by Peerless and Richard Knight constituted one or more misappropriations of the trade secrets under the DTSA.

286.    Even after Plaintiffs moved for sanctions against Peerless in Case III, Peerless and Richard Knight marketed to Local Access's customers and customers' customers by using information derived from the Productions and from records Peerless gathered for the provision of telecommunications services.  This use of Local Access's proprietary information was not permissible in or related to the litigation of Case III.

287.    Even after Plaintiffs moved for sanctions against Peerless in Case III, Peerless and Richard Knight sold services to Local Access's customers and customers' customers by using information derived from the Productions and from records Peerless gathered for the provision of telecommunications services. This use of Local Access's proprietary information was not permissible in or related to the litigation of Case III.

288.    Even after Plaintiffs moved for sanctions against Peerless in Case III, Peerless and Richard Knight stole customers and traffic from Local Access, for Peerless

and its affiliates and subsidiaries, by using information derived from the Productions and from records Peerless gathered for the provision of telecommunications services. This use of Local Access's proprietary information was not permissible in or related to the litigation of Case III.

289.   As a direct and proximate result of the use and disclosure of Local Access's trade secrets by Peerless and Richard Knight, Local Access has suffered actual damages of the following nature:

a.   Peerless and Richard Knight used the trade secrets to steal Local Access's customers, Local Access's customers' customers, Local Access's traffic, and/or Local Access's customers' traffic for Peerless and its affiliates and subsidiaries; all of which resulted in lost revenue for Local Access.

b.   Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, worked with KDW and Catherine James to analyze Local Access's trade secrets for more effective marketing to Local Access's customers and Local Access's customers' customers, resulting in the loss of revenue for Local Access.

c.   Peerless and Richard Knight used Local Access's trade secrets to solicit Local Access's customers and to involve or try to involve those customers in litigation, so as to drive customers and traffic away from Local Access, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Local Access.

d.  Peerless used the trade secrets it received from KDW, Henry Kelly and Catherine James, and misconstrued that information, to terminate its contract with Local Access wrongfully and prematurely, resulting in significant monetary loss to Local Access.  But for Peerless's misappropriation of Local Access's trade secrets, Peerless would not have terminated the contract prematurely.

e.  The stay of Case III, which has lasted for more than three years, would not have occurred but for the misappropriation of Local Access's and Blitz's trade secrets by Peerless and Richard Knight.  That stay has resulted in the expiration of most, and perhaps all, of the remaining period that Local Access had on its contract with Peerless.  Thus, Local Access has lost the benefit of its contract with Peerless as a result of the misappropriations by Peerless and Richard Knight.

f.  The stay of Case III for prosecution of the sanctions arising from KDW's and Peerless's violations of the Protective Order have caused Local Access to incur attorneys' fees and litigation expenses that it would not have otherwise incurred.  While some of these fees and costs may be recovered in the sanctions phase of Case III, any fees and costs that are not recovered in that proceeding would be recoverable in this action as consequential damages.

290.  In addition, Peerless has been unjustly enriched by its and Richard Knight's disclosure and use of Local Access's trade secrets in that Peerless has received additional customers, traffic and revenue that it would not have received but for

the misappropriation of Local Access's trade secrets. The additional revenue that Peerless has received as the result of its and Richard Knight's misappropriations should be disgorged and awarded to Local Access pursuant to 18 USC §1836(3)(B)(i)(II).

291.    Richard Knight has been unjustly enriched by his and Peerless's disclosure and use of Local Access's trade secrets in that he has received compensation, performance bonuses, dividends, increases in stock value, and other pecuniary gain as a result of the traffic and revenue that Peerless obtained from using Local Access's trade secrets. The additional revenue that Richard Knight has received as the result of his and Peerless's misappropriations should be disgorged and awarded to Local Access pursuant to 18 USC §1836(3)(B)(i)(II).

292.    Peerless and Richard Knight misappropriated Local Access's trade secrets willfully and maliciously, such that exemplary damages are appropriate under 18 U.S.C. §1836(3)(C).

293.    Peerless and Richard Knight misappropriated Local Access's trade secrets willfully and maliciously, such that Local Access is entitled to an award of its reasonable attorneys' fees upon prevailing in this action, pursuant to 18 U.S.C. §1836(3)(D).

WHEREFORE, LOCAL ACCESS, LLC demands entry of a judgment awarding the following:

a. All actual losses and expenses incurred by Local Access as a result of the misappropriation of Local Access's trade secrets by Peerless and Richard Knight, with joint and several liability for such damages;

b.  All amounts by which Peerless and Richard Knight have been unjustly

    enriched as a result of their misappropriations of Local Access's trade

    secrets, and disgorgement of same from those defendants;

c.  Exemplary damages in an amount not more than two times the amounts

    awarded under subparagraphs (a) and (b) above;

d.  All reasonable attorneys' fees and costs incurred by Local Access in this

    litigation; and

e.  All other relief this Court deems just and equitable under the circumstances.


**COUNT V - Florida Uniform Trade Secrets Act**
**(Blitz v. KDW, Henry Kelly and Catherine James)**

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as

though fully restated herein, and further state:

294.   This is an action for remedies under the Florida Uniform Trade Secrets

Act, §688.002 -688.009, Fla. Stat.  (the "FUTSA").

295.   The information contained in the Productions contained proprietary

customer information owned by Blitz, including but not limited to the names of Blitz's

and Local Access's customers (which constitutes a "customer list", as that term is used

in the FUTSA), the names of Blitz's customers' customers (which constitutes a

"customer list," as that term is used in the FUTSA), telephone numbers that could be

used to identify Blitz's customers and its customers' customers, routing information, DID

volumes, traffic information, and proprietary coding information.  Blitz derived

independent economic value from the secrecy of this information in that the information

could be used by competitors to analyze the volume of DIDs, the minutes of use, the

growth or reduction in traffic, the routing information, and other information that would allow competitors to identify which of Blitz's customers to target, what services to offer those customers, and where it would be advantageous to provide credits for certain services in order to promote sales of other lucrative services. The value of the secrecy of this information is evinced, in part, by the losses that Blitz incurred once Peerless obtained and used Blitz's proprietary information to market to Blitz's customers.

296. The CDRs contained in the Productions also contain proprietary coding information that Plaintiffs developed for ease of sorting and managing the data contained within the CDRs, as well as customized coding that Plaintiffs developed to address specific requests of their customers. The creation and use of these codes, and the codes themselves, are not industry practice and standard, and are unique developments that Plaintiffs use to analyze their own status with customers and financial standing, as well as to market to their existing and potential customers. Plaintiffs' willingness and ability to provide customized coding for customers provide Plaintiffs with a marketing advantage over larger carriers and aggregators, thereby providing Plaintiffs with independent economic value through the secrecy of that information.

297. The nature of the proprietary information at issue is set forth in more detail in paragraphs 44 through 72, above.

298. This proprietary information constitutes information, compilations, methods and processes that are subject to the efforts of Blitz that are reasonable under the circumstances to maintain their secrecy.

299.    This proprietary information derives actual and/or potential independent economic value to Blitz in that it is not generally known to Blitz's competitors, is not readily ascertainable by its competitors by proper means, and Blitz's competitors could obtain economic value from the disclosure or use of the proprietary information.  The economic value that Blitz derives is evinced, in part, by the losses Blitz suffered as a direct result of Peerless's acquisition and use of the proprietary information contained in the Productions, including the loss of business and the loss of resale value of Blitz's accounts.

300.    Because Blitz makes significant efforts to maintain the secrecy of the described proprietary information, and derives economic benefit from the maintenance of the secrecy of the information, this proprietary information constitutes trade secrets under the FUTSA.

301.    Local Access, who lawfully had Blitz's trade secrets and who was required to maintain their secrecy, refused to disclose the proprietary information to KDW, Henry Kelly and Catherine James until a court of competent jurisdiction ordered Local Access to produce the proprietary information within the terms of a valid Protective Order.

302.    Local Access designated the December 2017 Production as Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for KDW, Henry Kelly and Catherine James to maintain the secrecy of Blitz's trade secrets and limit the use of Blitz's trade secrets.

303.    Local Access designated the January 2018 Production and the April 2018 Production as Highly Confidential pursuant to the terms of the Protective Order, with the

70

knowledge and understanding that the Protective Order created an obligation for KDW, Henry Kelly and Catherine James to maintain the secrecy of Blitz's trade secrets and limit the use of Blitz's trade secrets.

304.   Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James provided Blitz's proprietary information to Peerless and its employees (including but not limited to Bob Sherman, Scott Kell, John Barnicle and Richard Knight) in direct violation of the obligation of secrecy and the limitation of use that KDW, Henry Kelly and Catherine James all knew to exist within the Protective Order relative to Confidential and Highly Confidential designated information. This disclosure was not permissible in or related to the litigation of Case III.

305.   Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James used Blitz's proprietary information in direct violation of the limitations of use that KDW, Henry Kelly and Catherine James all knew to exist relative to Confidential and Highly Confidential designated information.  This use was not permissible in or related to the litigation of Case III.

306.   At the time that KDW, Henry Kelly and Catherine James disclosed and used Blitz's protected trade secrets, they each knew or had reason to know that the information was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and limiting the use of the trade secrets.

307.   The disclosure and use of Blitz's trade secrets by KDW, Henry Kelly and Catherine James constituted one or more misappropriations of the trade secrets under the FUTSA.

308.   Even while and after the parties litigated the "Sanctions Phase" in Case III, KDW, Henry Kelly and Catherine James conspired with Peerless to conceal and assist Peerless's marketing to Blitz's customers and customers' customers by allowing Peerless to use the proprietary information contained within the Productions and by failing to implement the safeguards against such use that they represented would be put in place.  These actions were not permissible in or related to the litigation of Case III.

309.   Even while and after the parties litigated the "Sanctions Phase" in Case III, KDW, Henry Kelly and Catherine James conspired with Peerless to conceal and assist Peerless's efforts to steal Blitz's customers and customers' customers, and to convert their business for the use and benefit of Peerless and its affiliates and subsidiaries, failing to implement the safeguards against such use that they represented would be put in place.  These actions were not permissible in or related to the litigation of Case III.

310.   Each instance of marketing to Blitz's customers and customers' customers using Blitz's proprietary information constituted a separate and independent misappropriation of Blitz's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

311.   Each instance of entering into a contract with Blitz's customers and customers' customers as the result of marketing efforts that used Blitz's proprietary information constituted a separate and independent misappropriation of Blitz's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

312.   Each instance of porting numbers that belonged to Blitz's customers and customers' customers as the result of marketing efforts that used Blitz's proprietary

information constituted a separate and independent misappropriation of Blitz's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

313.    As a direct and proximate result of the use and disclosure of Blitz's trade secrets by KDW, Henry Kelly and Catherine James; Blitz has suffered actual damages of the following nature:

a.  Peerless and its Executive Vice President of Sales and Marketing, Richard Knight, used the trade secrets it received from KDW, Henry Kelly and Catherine James to steal Blitz's customers, Blitz's customers' customers, Blitz's traffic, and/or Blitz's customers' traffic; all of which resulted in lost revenue for Blitz.

b.  Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, worked with KDW and Catherine James to analyze Blitz's trade secrets for more effective marketing to Blitz's customers and Blitz's customers' customers, resulting in the loss of revenue for Blitz.

c.  KDW, Peerless and their respective employees have used Blitz's trade secrets, which KDW, Henry Kelly and Catherine James used and disclosed to Peerless, to solicit Blitz's customers and to involve or try to involve those customers in litigation, so as to drive customers and traffic away from Blitz, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Blitz.

    d.   When Blitz entered into an Asset Purchase Agreement that would have sold Blitz assets (including customer contracts) for nearly $15 Million, the purchaser terminated the agreement for the sole reason that Peerless was using the trade secrets that Peerless had acquired from KDW, Henry Kelly and Catherine James to market to customers whose contracts were part of the sale.

314.    In addition, KDW has been unjustly enriched by its disclosure and use of Blitz's trade secrets in that the violations of the protective order by KDW, Henry Kelly, Catherine James, Peerless and Richard Knight have been the subject of sanctions motions in Case III that has been on-going for more than two years, all of which time KDW has been compensated by Peerless for representation in those proceedings. Absent the improper disclosure and use of Blitz's and Local Access's trade secrets, Case III would not have been stayed and KDW would not have received the fees and/or compensation from Peerless that it has received since June 2018 relative to the litigation of the sanctions issues.  The fees and/or compensation, by which KDW has been unjustly enriched, should be disgorged and awarded to Blitz pursuant to §688.004(1), Fla. Stat.

315.    KDW, Henry Kelly and Catherine James misappropriated Blitz's trade secrets willfully and maliciously, such that exemplary damages are appropriate under §688.004(2), Fla. Stat.

316.    KDW, Henry Kelly and Catherine James misappropriated Blitz's trade secrets willfully and maliciously, such that Blitz is entitled to an award of its reasonable attorneys' fees upon prevailing in this action, pursuant to §688.005, Fla. Stat.

WHEREFORE, BLITZ TELECOM CONSULTING, LLC demands entry of a judgment awarding the following:

a.  All actual losses incurred by Blitz as a result of the misappropriation of Blitz's trade secrets by KDW, Henry Kelly and Catherine James, with joint and several liability for such damages;

b.  All amounts by which KDW, Henry Kelly and Catherine James have been unjustly enriched as a result of their misappropriations of Blitz's trade secrets, and disgorgement of same rom those defendants;

c.  Exemplary damages in an amount not more than two times the amounts awarded under subparagraphs (a) and (b) above;

d.  All reasonable attorneys' fees and costs incurred by Blitz in this litigation; and

e.  All other relief this Court deems just and equitable under the circumstances.

## COUNT VI - Florida Uniform Trade Secrets Act
### (Local Access v. KDW, Henry Kelly and Catherine James)

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as though fully restated herein, and further state:

317.  This is an action for remedies under the Florida Uniform Trade Secrets Act, §688.002-688.009, Fla. Stat.  (the "FUTSA").

318.  The information contained in the Productions contained proprietary customer information owned by Local Access, including but not limited to the names of Local Access's customers (which constitutes a "customer list", as that term is used in the FUTSA), the names Local Access's customers' customers (which constitutes a "customer list", as that term is used in the FUTSA), telephone numbers that could be used to identify Local Access's customers and its customers' customers, routing

information, DID volumes traffic information, and proprietary coding information.   Local

Access derived independent economic value from the secrecy of this information in that

the information could be used by competitors to analyze the volume of DIDs, the

minutes of use, the growth or reduction in traffic, the routing information, and other

information that would allow competitors to identify which customers and customers'

customers of Local Access to target, what services to offer those customers, and where

it would be advantageous to provide credits for certain services in order to promote

sales of other lucrative services.   The value of the secrecy of this information is evinced,

in part, by the losses that Local Access incurred once Peerless obtained and used Local

Access's proprietary information to market to Local Access's customers.

319.   The CDRs contained in the Productions also contain proprietary coding

information that Plaintiffs developed for ease of sorting and managing the data

contained within the CDRs, as well as customized coding that Plaintiffs developed to

address specific requests of their customers.   The creation and use of these codes, and

the codes themselves, are not industry practice and standard, and are unique

developments that Plaintiffs use to analyze their own status with customers and

financial standing, as well as to market to their existing and potential customers.

Plaintiffs' willingness and ability to provide customized coding for customers provide

Plaintiffs with a marketing advantage over larger carriers and aggregators, thereby

providing Plaintiffs with independent economic value through the secrecy of that

information.

320.   The nature of the proprietary information at issue is set forth in more detail

in paragraphs 44 through 72, above.

321.    The information contained in the May 2018 Production also contained confidential contracts between Local Access and it customers.  Within those contracts was trade secret information, including but not limited to customer identifications, types of traffic provided for those customers, pricing information, expected and minimum traffic levels, contract durations and other contract terms that would provide Local Access's customers with the ability to target Local Access's customers and to analyze the services, pricing and terms to offer those customers so as to undercut Local Access and take Local Access's customers.

322.    This proprietary information constitutes information, compilations, methods and processes that are subject to the efforts of Blitz that are reasonable under the circumstances to maintain their secrecy. This proprietary information derives independent economic value to Local Access in that it is not generally known to Local Access's competitors, is not readily ascertainable by Local Access's competitors by proper means, and Local Access's competitors could obtain economic value from the disclosure or use of the information.  The economic value that Local Access derives is evinced, in part, by the losses Local Access suffered as a direct result of Peerless's acquisition and use of the proprietary information contained in the Productions.

323.    Because Local Access makes significant efforts to maintain the secrecy of the described proprietary information, and derives economic benefit from the maintenance of the secrecy of the information, this proprietary information constitutes trade secrets under the FUTSA.

324.    Local Access refused to disclose the proprietary information to KDW, Henry Kelly and Catherine James until a court of competent jurisdiction ordered Local

Access to produce the proprietary information within the terms of a valid Protective Order.

325.   Local Access designated the December 2017 Production as Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for KDW, Henry Kelly and Catherine James to maintain the secrecy of Local Access's trade secrets and limit the use of Local Access's trade secrets.

326.   Local Access designated the January 2018 Production, the April 2018 Production and the May 2018 Production as Highly Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for KDW, Henry Kelly and Catherine James to maintain the secrecy of Local Access's trade secrets and limit the use of Local Access's trade secrets.

327.   Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James provided Local Access's trade secrets to Peerless and its employees (including but not limited to Bob Sherman, Scott Kell, John Barnicle and Richard Knight) in direct violation of the obligation of secrecy and the limitation of use that KDW, Henry Kelly and Catherine James all knew to exist relative to Confidential and Highly Confidential designated information.  This disclosure was not permissible in or related to the litigation of Case III.

328.   Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James used Local Access's trade secrets in direct violation of the limitations of use that KDW, Henry Kelly and Catherine James all knew to exist relative to

Confidential and Highly Confidential designated information.  This use was not permissible in or related to the litigation of Case III.

329.    At the time that KDW, Henry Kelly and Catherine James disclosed and used Local Access's protected trade secrets, they each knew or had reason to know that the information was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and limiting the use of the trade secrets.

330.    The disclosure and use of Local Access's trade secrets by KDW, Henry Kelly and Catherine James constituted one or more misappropriations of the trade secrets under the FUTSA.

331.    Even while and after the parties litigated the "Sanctions Phase" in Case III, KDW, Henry Kelly and Catherine James conspired with Peerless to conceal and assist Peerless's marketing to Local Access's customers and customers' customers by allowing Peerless to use the proprietary information contained within the Productions and by failing to implement the safeguards against such use that they represented would be put in place.  These actions were not permissible in or related to the litigation of Case III.

332.    Even while and after the parties litigated the "Sanctions Phase" in Case III, KDW, Henry Kelly and Catherine James conspired with Peerless to conceal and assist Peerless's efforts to steal Local Access's customers and customers' customers, and to convert their business for the use and benefit of Peerless and its affiliates and subsidiaries, failing to implement the safeguards against such use that they represented would be put in place.  These actions were not permissible in or related to the litigation of Case III.

333.   Each instance of marketing to Local Access's customers and customers' customers using Blitz's proprietary information constituted a separate and independent misappropriation of Local Access's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

334.   Each instance of entering into a contract with Local Access's customers and customers' customers as the result of marketing efforts that used Local Access's proprietary information constituted a separate and independent misappropriation of Local Access's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

335.   Each instance of porting numbers that belonged to Local Access's customers and customers' customers as the result of marketing efforts that used Local Access's proprietary information constituted a separate and independent misappropriation of Local Access's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

336.   As a direct and proximate result of the use and disclosure of Local Access's trade secrets by KDW, Henry Kelly and Catherine James, Local Access has suffered actual damages of the following nature:

a.  Peerless and its Executive Vice President of Sales and Marketing, Richard Knight, used the trade secrets it received from KDW, Henry Kelly and Catherine James to steal Local Access's customers, Local Access's customers' customers, Local Access's traffic, and/or Local

Access's customers' traffic; all of which resulted in lost revenue for Local Access.

b. Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, worked with KDW and Catherine James to analyze Local Access's trade secrets for more effective marketing to Local Access's customers and Local Access's customers' customers, resulting in the loss of revenue for Local Access.

c. KDW, Peerless and their respective employees have used Local Access's trade secrets, which KDW, Henry Kelly and Catherine James used and disclosed to Peerless, to solicit Local Access's customers and to involve or try to involve those customers in litigation, so as to drive customers and traffic away from Local Access, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Local Access.

d. Peerless used the trade secrets it received from KDW, Henry Kelly and Catherine James, and Peerless's misconstruction of that information, to terminate its contract with Local Access wrongfully and prematurely, resulting in significant monetary loss to Local Access. But for KDW, Henry Kelly and Catherine James providing Local Access's trade secrets to Peerless improperly, Peerless would not have terminated the contract prematurely.

e. The stay of Case III, which has lasted for more than two years, would not have occurred but for the misappropriation of Local Access's and

Blitz's trade secrets by KDW, Henry Kelly and Catherine James.  That stay has resulted in the expiration of most, and perhaps all, of the remaining period that Local Access had on its contract with Peerless. Thus, Local Access has lost the benefit of its contract with Peerless as a result of the misappropriations by KDW, Henry Kelly and Catherine James.

f.   The stay of Case III for prosecution of the sanctions arising from KDW's and Peerless's violations of the Protective Order have caused Local Access to incur attorneys' fees and litigation expenses that it would not have otherwise incurred.  While some of these fees and costs may be recovered in the sanctions phase of Case III, any fees and costs that are not recovered in that proceeding would be recoverable in this action as consequential damages.

337.   In addition, KDW has been unjustly enriched by its disclosure and use of Local Access's trade secrets in that the violations of the protective order by KDW, Henry Kelly, Catherine James, Peerless and Richard Knight have been the subject of sanctions motions in Case III that has been on-going for more than three years, all of which time KDW has been paid by Peerless for representation in those proceedings. Absent the improper disclosure and use of Local Access's trade secrets, Case III would not have been stayed and KDW would not have received the fees from Peerless that it has received since June 2018 relative to the litigation of the sanctions issues.  The fees and/or compensation, by which KDW has been unjustly enriched, should be disgorged and awarded to Local Access pursuant to §688.004(1), Fla. Stat

82

338.   KDW, Henry Kelly and Catherine James misappropriated Local Access's trade secrets willfully and maliciously, such that exemplary damages are appropriate under §688.004(2), Fla. Stat.

339.   KDW, Henry Kelly and Catherine James misappropriated Local Access's trade secrets willfully and maliciously, such that Local Access is entitled to an award of its reasonable attorneys' fees upon prevailing in this action, pursuant to §688.005, Fla. Stat.

WHEREFORE, LOCAL ACCESS, LLC demands entry of a judgment awarding the following:

a.  All actual losses and expenses incurred by Local Access as a result of the misappropriation of Local Access's trade secrets by KDW, Henry Kelly and Catherine James, with joint and several liability for such damages;

b.  All amounts by which KDW, Henry Kelly and Catherine James have been unjustly enriched as a result of their misappropriations of Local Access's trade secrets, and disgorgement of same from those defendants;

c.  Exemplary damages in an amount not more than two times the amounts awarded under subparagraphs (a) and (b) above;

d.  All reasonable attorneys' fees and costs incurred by Local Access in this litigation; and

e.  All other relief this Court deems just and equitable under the circumstances.

### COUNT VII - Florida Uniform Trade Secrets Act
### (Blitz v. Peerless and Richard Knight)

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as though fully restated herein, and further state:

340.    This is an action for remedies under the Florida Uniform Trade Secrets Act, §688.002-688.009, Fla. Stat.  (the "FUTSA").

341.    The information contained in the Productions contained proprietary customer information owned by Blitz, including the names of Blitz's customers (which constitutes a "customer list," as that term is used in the FUTSA), the names of Blitz's customers' customers (which constitutes a "customer list," as that term is used in the FUTSA), and/or telephone numbers that could be used to identify Blitz's customers and their customers' customers, routing information, DID volumes, traffic information, and proprietary coding information.  Blitz derived independent economic value from the secrecy of this information in that the information could be used by competitors to analyze the volume of DIDs, the minutes of use, the growth or reduction in traffic, the routing information, and other information that would allow competitors to identify which of Blitz's customers to target, what services to offer those customers, and where it would be advantageous to provide credits for certain services in order to promote sales of other lucrative services.  The value of the secrecy of this information is evinced, in part, by the losses that Blitz incurred once Peerless obtained and used Blitz's proprietary information to market to Blitz's customers.

342.    The CDRs contained in the Productions also contain proprietary coding information that Plaintiffs developed for ease of sorting and managing the data contained within the CDRs, as well as customized coding that Plaintiffs developed to address specific requests of their customers.  The creation and use of these codes, and the codes themselves, are not industry practice and standard, and are unique developments that Plaintiffs use to analyze their own status with customers and

84

financial standing, as well as to market to their existing and potential customers. Plaintiffs' willingness and ability to provide customized coding for customers provide Plaintiffs with a marketing advantage over larger carriers and aggregators, thereby providing Plaintiffs with independent economic value through the secrecy of that information.

343.   The nature of the proprietary information at issue is set forth in more detail in paragraphs 44 through 72, above.

344.   The proprietary information contained in the Productions constitutes information, compilations, methods and processes that are subject to the efforts of Blitz that are reasonable under the circumstances to maintain their secrecy.

345.   This proprietary information derives independent economic value to Blitz in that it is not generally known to Blitz's competitors, is not readily ascertainable by Blitz's competitors by proper means, and Blitz's competitors could obtain economic value from the disclosure or use of the information.  The economic value that Blitz derives is evinced, in part, by the losses Blitz suffered as a direct result of Peerless's acquisition and use of the proprietary information contained in the Productions, including the loss of business and the loss of resale value of Blitz's accounts.

346.   Because Blitz makes significant efforts to maintain the secrecy of the described proprietary information, and derives economic benefit from the maintenance of the secrecy of the information, this proprietary information constitutes trade secrets under the FUTSA.

347.    Local Access refused to disclose the proprietary information to Peerless, its employees or its counsel until a court of competent jurisdiction ordered Local Access to produce the proprietary information within the terms of a valid Protective Order.

348.    Local Access, who lawfully had Blitz's trade secrets and who was required to maintain its secrecy,  designated the December 2017 Production as Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for Peerless and its employees, including but not limited to Richard Knight, to maintain the secrecy of Blitz's trade secrets and limit the use of Blitz's trade secrets.

349.    Local Access designated the January 2018 Production and the April 2018 Production as Highly Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order would preclude Peerless and its employees from obtaining Blitz's trade secrets from Peerless's counsel.

350.    Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James, Peerless's agents and representatives, provided Blitz's proprietary information to Peerless and its employees (including but not limited to Bob Sherman, Scott Kell, John Barnicle and Richard Knight) in direct violation of the obligation of secrecy and the limitation of use that KDW, Henry Kelly and Catherine James all knew to exist relative to Confidential and Highly Confidential designated information.  This disclosure was not permissible in or related to the litigation of Case III.

351.    At the time they acquired Blitz's trade secrets that had been designated as Highly Confidential, Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, knew or had reason to know that the Protective Order

precluded them from acquiring those trade secrets.  Thus, Peerless and its employees knew or had reason to know that they were acquiring Blitz's trade secrets by improper means.

352.   Upon acquiring Blitz's trade secrets, Peerless and its employees, including but not limited to Bob Sherman and Scott Kell, used the information in direct violation of the limitations of use that Peerless and its employees knew or had reason to know were in place under the Protective Order. This use was not permissible in or related to the litigation of Case III.

353.   Peerless and its employees, including Bob Sherman and Scott Kell, worked in conjunction with KDW and Catherine James to analyze Blitz's trade secrets, when all of them knew or had reason to know that Peerless and its employees should not see or be in possession of those trade secrets. This use was not permissible in or related to the litigation of Case III.

354.   Upon acquiring Blitz's trade secrets from KDW and Catherine James, Peerless and Richard Knight used those trade secrets to market to Blitz's customers and customers' customers. This use was not permissible in or related to the litigation of Case III.

355.   Peerless and Richard Knight worked in conjunction with KDW and Catherine James to analyze Blitz's trade secrets and to use those trade secrets for illegal and improper means.  This use was not permissible in or related to the litigation of Case III.

356.   Richard Knight, as Executive Vice President of Sales and Marketing for Peerless, and in furtherance of his personal pecuniary interests, further disclosed Blitz's

trade secrets to other Peerless employees, including but not limited to Brian Brabson, Margaret McNerney and Jeff Davis. This disclosure was not permissible in or related to the litigation of Case III.

357.   At the time that Richard Knight disclosed Blitz's trade secrets to other Peerless employees, he knew or had reason to know that he owed a duty to maintain the secrecy of the trade secrets and to limit their use.

358.   The disclosure and use of Blitz's trade secrets by Peerless and Richard Knight constituted one or more misappropriations of the trade secrets under the FUTSA.

359.   Even while and after the parties litigated the "Sanctions Phase" in Case III, Peerless continued to market to Blitz's customers and customers' customers by using the proprietary information contained within the Productions.  This use was not permissible in or related to the litigation of Case III.

360.   Even while and after the parties litigated the "Sanctions Phase" in Case III, Peerless continued to steal Blitz's customers and customers' customers, and to convert their business for the use and benefit of Peerless and its affiliates and subsidiaries, by using the proprietary information contained within the Productions.  This use was not permissible in or related to the litigation of Case III.

361.   Each instance of marketing to Blitz's customers and customers' customers using Blitz's proprietary information constituted a separate and independent misappropriation of Blitz's trade secrets by Peerless and Richard Knight.

362.   Each instance of entering into a contract with Blitz's customers and customers' customers as the result of marketing efforts that used Blitz's proprietary

information constituted a separate and independent misappropriation of Blitz's trade secrets by Peerless and Richard Knight.

363.    Each instance of porting numbers that belonged to Blitz's customers and customers' customers as the result of marketing efforts that used Blitz's proprietary information constituted a separate and independent misappropriation of Blitz's trade secrets by Peerless and Richard Knight.

364.    As a direct and proximate result of the use and disclosure of Blitz's trade secrets by Peerless and Richard Knight, Blitz has suffered actual damages of the following nature:

  a.  Peerless and Richard Knight used the trade secrets to steal Blitz's customers, Blitz's customers' customers, Blitz's traffic, and/or Blitz's customers' traffic; all of which resulted in lost revenue for Blitz.

  b.  Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, worked with KDW and Catherine James to analyze Blitz's trade secrets for more effective marketing to Blitz's customers and Blitz's customers' customers, resulting in the loss of revenue for Blitz.

  c.  Peerless and Richard Knight used Blitz's trade secrets to solicit Blitz's customers and to involve or try to involve those customers in litigation, so as to drive customers and traffic away from Blitz, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Blitz.

     d.   When Blitz entered into the Valor APA that would have sold Blitz assets (including customer contracts) for nearly $15 Million, the purchaser terminated the agreement for the sole reason that Peerless and Richard Knight were using Blitz's trade secrets to market to customers whose contracts were part of the sale.

365.   Peerless has been unjustly enriched by its and Richard Knight's disclosure and use of Blitz's trade secrets in that Peerless has received additional customers, traffic and revenue that it would not have received but for the misappropriation of Blitz's and Local Access's trade secrets.  The additional revenue that Peerless has received as the result of its and Richard Knight's misappropriations should be disgorged and awarded to Blitz pursuant to §688.004 (1), Fla. Stat.

366.   Richard Knight has been unjustly enriched by his and Peerless's disclosure and use of Blitz's trade secrets in that he has received compensation, performance bonuses, dividends, increases in stock value, and other pecuniary gain as a result of the traffic and revenue that Peerless obtained from using Blitz's trade secrets.  The additional revenue that Richard Knight has received as the result of his and Peerless's misappropriations should be disgorged and awarded to Blitz pursuant to §688.004(1), Fla. Stat.

367.   Peerless and Richard Knight misappropriated Blitz's trade secrets willfully and maliciously, such that exemplary damages are appropriate under §688.004(2), Fla. Stat.

368.   Peerless and Richard Knight misappropriated Blitz's and Local Access's trade secrets willfully and maliciously, such that Blitz is entitled to an award of its

reasonable attorneys' fees upon prevailing in this action, pursuant to §688.005, Fla. Stat.

WHEREFORE, BLITZ TELECOM CONSULTING, LLC demands entry of a judgment awarding the following:

a. All actual losses incurred by Blitz as a result of the misappropriation of Blitz's trade secrets by Peerless and Richard Knight, with joint and several liability for such damages;

b. All amounts by which Peerless and Richard Knight have been unjustly enriched as a result of their misappropriations of Blitz's trade secrets, and disgorgement of same from those defendants;

c. Exemplary damages in an amount not more than two times the amounts awarded under subparagraphs (a) and (b) above;

d. All reasonable attorneys' fees and costs incurred by Blitz in this litigation; and

e. All other relief this Court deems just and equitable under the circumstances.

### COUNT VIII - Florida Uniform Trade Secrets Act
### (Local Access v. Peerless and Richard Knight)

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as though fully restated herein, and further state:

369.   This is an action for remedies under the Florida Uniform Trade Secrets Act, §688.002-688.009, Fla. Stat.  (the "FUTSA").

370.   The information contained in the Productions contained proprietary customer information owned by Local Access, including but not limited to the names of Local Access's customers (which constitutes a "customer list," as that term is used in the FUTSA), the names of Local Access's customers' customers (which constitutes a

"customer list," as that term is used in the FUTSA), telephone numbers that could be used to identify Local Access's customers and its customers' customers, routing information, DID volumes, traffic information, and proprietary coding information.

371.   Local Access derived independent economic value from the secrecy of this information in that the information could be used by competitors to analyze the volume of DIDs, the minutes of use, the growth or reduction in traffic, the routing information, and other information that would allow competitors to identify which of Local Access's customers to target, what services to offer those customers, and where it would be advantageous to provide credits for certain services in order to promote sales of other lucrative services.  The value of the secrecy of this information is evinced, in part, by the losses that Local Access incurred once Peerless obtained and used Local Access's proprietary information to market to Local Access's customers.

372.   The CDRs contained in the Productions also contain proprietary coding information that Plaintiffs developed for ease of sorting and managing the data contained within the CDRs, as well as customized coding that Plaintiffs developed to address specific requests of their customers.  The creation and use of these customized codes, and the codes themselves, are not industry practice and standard, and are unique developments that Plaintiffs use to market to their existing and potential customers.  Plaintiffs' willingness and ability to provide customized coding for customers provide Plaintiffs with a marketing advantage over larger carriers and aggregators, thereby providing Plaintiffs with independent economic value through the secrecy of that information.

373.    The nature of the proprietary information at issue is set forth in more detail in paragraphs 44 through 72, above.

374.    The CDRs also contained codes that are specific to proprietary processes for routing traffic, which if mined and understood by Local Access's competitors, could result in the development of competing processes and programs by competing carriers.

375.    The information contained in the May 2018 Production also contained confidential contracts between Local Access and it customers.  Within those contracts was trade secret information, including but not limited to customer identifications, types of traffic provided for those customers, pricing information, expected and minimum traffic levels, contract durations and other contract terms that would provide Local Access's customers with the ability to target Local Access's customers and to analyze the services, pricing and terms to offer those customers so as to undercut Local Access and take Local Access's customers.

376.    This proprietary information constitutes information, compilations, methods and processes that are subject to the efforts of Local Access that are reasonable under the circumstances to maintain their secrecy.

377.    This proprietary information derives independent economic value to Local Access in that it is not generally known to Local Access's competitors, is not readily ascertainable by Local Access's competitors by proper means, and Local Access's competitors could obtain economic value from the disclosure or use of the information. The economic value that Local Access derives is evinced, in part, by the losses Local Access suffered as a direct result of Peerless's acquisition and use of the proprietary

information contained in the Productions, including the loss of business and the loss of resale value of Local Access's accounts.

378.    Because Local Access makes significant efforts to maintain the secrecy of the described proprietary information, and derives economic benefit from the maintenance of the secrecy of the information, this proprietary information constitutes trade secrets under the FUTSA.

379.    Local Access refused to disclose the proprietary information to Peerless, its employees or its counsel until a court of competent jurisdiction ordered Local Access to produce the proprietary information within the terms of a valid Protective Order.

380.    Local Access designated the December 2017 Production as Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for Peerless and its employees, including but not limited to Richard Knight, to maintain the secrecy of Local Access's trade secrets and limit the use of Local Access's trade secrets.

381.    Local Access designated the January 2018 Production, the April 2018 Production and the May 2018 Production as Highly Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order would preclude Peerless and its employees from obtaining Local Access's trade secrets from Peerless's counsel.

382.    Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James, Peerless's agents and representatives, provided Local Access's proprietary information to Peerless and its employees (including but not limited to Bob Sherman, Scott Kell, John Barnicle and Richard Knight) in direct violation of the

obligation of secrecy and the limitation of use that KDW, Henry Kelly and Catherine James all knew to exist relative to Confidential and Highly Confidential designated information.  This dissemination of Local Access's proprietary information was not permissible in or related to the litigation of Case III

383.   At the time they acquired Local Access's trade secrets that had been designated as Highly Confidential, Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, knew or had reason to know that the Protective Order precluded them from acquiring those trade secrets.  Thus, Peerless and its employees knew or had reason to know that they were acquiring Local Access's trade secrets by improper means.

384.   Upon acquiring Local Access's trade secrets, Peerless and its employees, including Bob Sherman and Scott Kell, used the information in direct violation of the limitations of use that Peerless and its employees knew or had reason to know were in place under the Protective Order. This use was not permissible in or related to the litigation of Case III.

385.   Peerless and its employees, including Bob Sherman and Scott Kell, worked in conjunction with KDW and Catherine James to analyze Local Access's trade secrets, when all of them knew or had reason to know that Peerless and its employees should not see or be in possession of those trade secrets. This use was not permissible in or related to the litigation of Case III.

386.   Upon acquiring Local Access's trade secrets from KDW and Catherine James, Peerless and Richard Knight used those trade secrets to market to Local

Access's customers and customers' customers. This use was not permissible in or related to the litigation of Case III.

387.    Peerless and Richard Knight worked in conjunction with KDW and Catherine James to analyze Local Access's trade secrets and to use those trade secrets for illegal and improper means.

388.    Richard Knight, as Executive Vice President of Sales and Marketing for Peerless, and in furtherance of his personal pecuniary interests, further disclosed Local Access's trade secrets to other Peerless employees, including but not limited to Brian Brabson, Margaret McNerney and Jeff Davis.  This disclosure was not permissible in or related to the litigation of Case III.

389.    At the time that Richard Knight disclosed Local Access's trade secrets to other Peerless employees, he knew or had reason to know that he owed a duty to maintain the secrecy of the trade secrets and to limit their use.

390.    The disclosure and use of Local Access's trade secrets by Peerless and Richard Knight constituted one or more misappropriations of the trade secrets under the FUTSA.

391.    Even after Plaintiffs moved for sanctions against Peerless in Case III, Peerless and Richard Knight marketed to Local Access's customers and customers' customers by using information derived from the Productions and from records Peerless gathered for the provision of telecommunications services.  This use of Local Access's proprietary information was not permissible in or related to the litigation of Case III.

392.    Even after Plaintiffs moved for sanctions against Peerless in Case III, Peerless and Richard Knight sold services to Local Access's customers and customers'

customers by using information derived from the Productions and from records Peerless gathered for the provision of telecommunications services. This use of Local Access's proprietary information was not permissible in or related to the litigation of Case III.

393.   Even after Plaintiffs moved for sanctions against Peerless in Case III, Peerless and Richard Knight stole customers and traffic from Local Access, for Peerless and its affiliates and subsidiaries, by using information derived from the Productions and from records Peerless gathered for the provision of telecommunications services. This use of Local Access's proprietary information was not permissible in or related to the litigation of Case III.

394.   As a direct and proximate result of the use and disclosure of Local Access's trade secrets by Peerless and Richard Knight, Local Access has suffered actual damages of the following nature:

a. Peerless and Richard Knight used the trade secrets to steal Local Access's customers, Local Access's customers' customers, Local Access's traffic, and Local Access's customers' traffic for Peerless and its affiliates and subsidiaries; all of which resulted in lost revenue for Local Access.

b. Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, worked with KDW and Catherine James to analyze Local Access's trade secrets for more effective marketing to Local Access's customers and Local Access's customers' customers, resulting in the loss of revenue for Local Access.

c.  Peerless and Richard Knight used Local Access's trade secrets to solicit Local Access's customers and to involve or try to involve those customers in litigation, so as to drive customers and traffic away from Local Access, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Local Access.

d.  Peerless used the trade secrets it received from KDW, Henry Kelly and Catherine James, and misconstrued that information, to terminate its contract with Local Access wrongfully and prematurely, resulting in significant monetary loss to Local Access.  But for Peerless's misappropriation of Local Access's trade secrets, Peerless would not have terminated the contract prematurely.

e.  The stay of Case III, which has lasted for more than three years, would not have occurred but for the misappropriation of Local Access's and Blitz's trade secrets by Peerless and Richard Knight.  That stay has resulted in the expiration of most, and perhaps all, of the remaining period that Local Access had on its contract with Peerless.  Thus, Local Access has lost the benefit of its contract with Peerless as a result of the misappropriations by Peerless and Richard Knight.

f.  The stay of Case III for prosecution of the sanctions arising from KDW's and Peerless's violations of the Protective Order have caused Local Access to incur attorneys' fees and litigation expenses that it would not have otherwise incurred.  While some of these fees and costs may be recovered in the sanctions phase of Case III, any fees

and costs that are not recovered in that proceeding would be recoverable in this action as consequential damages.

395.    In addition, Peerless has been unjustly enriched by its and Richard Knight's disclosure and use of Local Access's trade secrets in that Peerless has received additional customers, traffic and revenue that it would not have received but for the misappropriation of Local Access's trade secrets.  The additional revenue that Peerless has received as the result of its and Richard Knight's misappropriations should be disgorged and awarded to Local Access pursuant to §688.004(1), Fla. Stat.

396.    Richard Knight has been unjustly enriched by his and Peerless's disclosure and use of Local Access's trade secrets in that he has received compensation, performance bonuses, dividends, increases in stock value, and other pecuniary gain as a result of the traffic and revenue that Peerless obtained from using Local Access's trade secrets.  The additional revenue that Richard Knight has received as the result of his and Peerless's misappropriations should be disgorged and awarded to Local Access pursuant to §688.004(1), Fla. Stat.

397.    Peerless and Richard Knight misappropriated Local Access's trade secrets willfully and maliciously, such that exemplary damages are appropriate under §688.004(2), Fla. Stat.

398.    Peerless and Richard Knight misappropriated Local Access's trade secrets willfully and maliciously, such that Local Access is entitled to an award of its reasonable attorneys' fees upon prevailing in this action, pursuant to §688.005, Fla. Stat.

WHEREFORE, LOCAL ACCESS, LLC demands entry of a judgment awarding the following:

a. All actual losses and expenses incurred by Local Access as a result of the misappropriation of Local Access's trade secrets by Peerless and Richard Knight, with joint and several liability for such damages;

b. All amounts by which Peerless and Richard Knight have been unjustly enriched as a result of their misappropriations of Local Access's trade secrets, and disgorgement of same from those defendants;

c. Exemplary damages in an amount not more than two times the amounts awarded under subparagraphs (a) and (b) above;

d. All reasonable attorneys' fees and costs incurred by Local Access in this litigation; and

e. All other relief this Court deems just and equitable under the circumstances.

## COUNT IX - Illinois Trade Secrets Act
### (Blitz v. KDW, Henry Kelly and Catherine James)

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as though fully restated herein, and further state:

399.    This is an action for remedies under the Illinois Trade Secrets Act, 765 ILCS 1065/1-9 (the "ITSA").

400.    The information contained in the Productions contained proprietary Customer information owned by Blitz, including but not limited to the names of Blitz's and Local Access's customers (which constitutes a "list of actual or potential customers," as that term is used in the ITSA), the names of Blitz's customers' customers (which constitutes a "list of actual or potential customers," as that term is

100

used in the ITSA),  telephone numbers that could be used to identify Blitz's customers and its customers' customers, routing information, DID volumes, traffic information, and proprietary coding information.  Blitz derived independent economic value from the secrecy of this information in that the information could be used by competitors to analyze the volume of DIDs, the minutes of use, the growth or reduction in traffic, the routing information, and other information that would allow competitors to identify which of Blitz's customers to target, what services to offer those customers, and where it would be advantageous to provide credits for certain services in order to promote sales of other lucrative services.  The value of the secrecy of this information is evinced, in part, by the losses that Blitz incurred once Peerless obtained and used Blitz's proprietary information to market to Blitz's customers.

401.    The CDRs contained in the Productions also contain proprietary coding information that Plaintiffs developed for ease of sorting and managing the data contained within the CDRs, as well as customized coding that Plaintiffs developed to address specific requests of their customers.  The creation and use of these codes, and the codes themselves, are not industry practice and standard, and are unique developments that Plaintiffs use to analyze their own status with customers and financial standing, as well as to market to their existing and potential customers.  Plaintiffs' willingness and ability to provide customized coding for customers provide Plaintiffs with a marketing advantage over larger carriers and aggregators, thereby providing Plaintiffs with independent economic value through the secrecy of that information.

402. The nature of the proprietary information at issue is set forth in more detail in paragraphs 44 through 72, above.

403. This proprietary information constitutes information that is subject to the efforts of Blitz that are reasonable under the circumstances to maintain its secrecy.

404. This proprietary information derives actual and/or potential independent economic value to Blitz in that it is not generally known to Blitz's competitors, is not readily ascertainable by its competitors by proper means, and Blitz's competitors could obtain economic value from the disclosure or use of the proprietary information. The economic value that Blitz derives is evinced, in part, by the losses Blitz suffered as a direct result of Peerless's acquisition and use of the proprietary information contained in the Productions, including the loss of business and the loss of resale value of Blitz's accounts.

405. Because Blitz makes significant efforts to maintain the secrecy of the described proprietary information, and derives economic benefit from the maintenance of the secrecy of the information, this proprietary information constitutes trade secrets under the ITSA.

406. Local Access, who lawfully had Blitz's trade secrets and who was required to maintain their secrecy, refused to disclose the proprietary information to KDW, Henry Kelly and Catherine James until a court of competent jurisdiction ordered Local Access to produce the proprietary information within the terms of a valid Protective Order.

407. Local Access designated the December 2017 Production as Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for KDW, Henry Kelly and Catherine

James to maintain the secrecy of Blitz's trade secrets and limit the use of Blitz's trade secrets.

408.    Local Access designated the January 2018 Production and the April 2018 Production as Highly Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for KDW, Henry Kelly and Catherine James to maintain the secrecy of Blitz's trade secrets and limit the use of Blitz's trade secrets.

409.    Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James provided Blitz's proprietary information to Peerless and its employees (including but not limited to Bob Sherman, Scott Kell, John Barnicle and Richard Knight) in direct violation of the obligation of secrecy and the limitation of use that KDW, Henry Kelly and Catherine James all knew to exist within the Protective Order relative to Confidential and Highly Confidential designated information. This disclosure was not permissible in or related to the litigation of Case III.

410.    Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James used Blitz's proprietary information in direct violation of the limitations of use that KDW, Henry Kelly and Catherine James all knew to exist relative to Confidential and Highly Confidential designated information.  This use was not permissible in or related to the litigation of Case III.

411.    At the time that KDW, Henry Kelly and Catherine James disclosed and used Blitz's protected trade secrets, they each knew or had reason to know that the information was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and limiting the use of the trade secrets.

412.    The disclosure and use of Blitz's trade secrets by KDW, Henry Kelly and Catherine James constituted one or more misappropriations of the trade secrets under the ITSA.

413.    Even while and after the parties litigated the "Sanctions Phase" in Case III, KDW, Henry Kelly and Catherine James conspired with Peerless to conceal and assist Peerless's marketing to Blitz's customers and customers' customers by allowing Peerless to use the proprietary information contained within the Productions and by failing to implement the safeguards against such use that they represented would be put in place.  These actions were not permissible in or related to the litigation of Case III.

414.    Even while and after the parties litigated the "Sanctions Phase" in Case III, KDW, Henry Kelly and Catherine James conspired with Peerless to conceal and assist Peerless's efforts to steal Blitz's customers and customers' customers, and to convert their business for the use and benefit of Peerless and its affiliates and subsidiaries, failing to implement the safeguards against such use that they represented would be put in place.  These actions were not permissible in or related to the litigation of Case III.

415.    Each instance of marketing to Blitz's customers and customers' customers using Blitz's proprietary information constituted a separate and independent misappropriation of Blitz's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

416.    Each instance of entering into a contract with Blitz's customers and customers' customers as the result of marketing efforts that used Blitz's proprietary information constituted a separate and independent misappropriation of Blitz's trade

secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

417.   Each instance of porting numbers that belonged to Blitz's customers and customers' customers as the result of marketing efforts that used Blitz's proprietary information constituted a separate and independent misappropriation of Blitz's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

418.   As a direct and proximate result of the use and disclosure of Blitz's trade secrets by KDW, Henry Kelly and Catherine James, Blitz has suffered actual damages of the following nature:

    a. Peerless and its Executive Vice President of Sales and Marketing, Richard Knight, used the trade secrets it received from KDW, Henry Kelly and Catherine James to steal Blitz's customers, Blitz's customers' customers, Blitz's traffic, and/or Blitz's customers' traffic; all of which resulted in lost revenue for Blitz.

    b. Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, worked with KDW and Catherine James to analyze Blitz's trade secrets for more effective marketing to Blitz's customers and Blitz's customers' customers, resulting in the loss of revenue for Blitz.

    c. KDW, Peerless and their respective employees have used Blitz's trade secrets, which KDW, Henry Kelly and Catherine James used and disclosed to Peerless, to solicit Blitz's customers and to involve or try

to involve those customers in litigation, so as to drive customers and traffic away from Blitz, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Blitz.

d.  When Blitz entered into the Valor APA, which would have sold Blitz assets (including customer contracts) for nearly $15 Million, the purchaser terminated the agreement for the sole reason that Peerless was using the trade secrets that Peerless had acquired from KDW, Henry Kelly and Catherine James to market to customers whose contracts were part of the sale.

419.   In addition, KDW has been unjustly enriched by its disclosure and use of Blitz's trade secrets in that the violations of the protective order by KDW, Henry Kelly, Catherine James, Peerless and Richard Knight have been the subject of sanctions motions in Case III that has been on-going for more than two years, all of which time KDW has been compensated by Peerless for representation in those proceedings. Absent the improper disclosure and use of Blitz's and Local Access's trade secrets, Case III would not have been stayed and KDW would not have received the fees and/or compensation from Peerless that it has received since June 2018 relative to the litigation of the sanctions issues.  The fees and/or compensation, by which KDW has been unjustly enriched, should be disgorged and awarded to Blitz pursuant to 765 ILCS 1065/4(a).

420.   KDW, Henry Kelly and Catherine James misappropriated Blitz's trade secrets willfully and maliciously, such that exemplary damages are appropriate pursuant to 765 ILCS 1065/4(b).

421.    KDW, Henry Kelly and Catherine James misappropriated Blitz's trade secrets willfully and maliciously, such that Blitz is entitled to an award of its reasonable attorneys' fees upon prevailing in this action, pursuant to 765 ILCS 1065/5.

WHEREFORE, BLITZ TELECOM CONSULTING, LLC demands entry of a judgment awarding the following:

a.  All actual losses incurred by Blitz as a result of the misappropriation of Blitz's trade secrets by KDW, Henry Kelly and Catherine James, with joint and several liability for such damages;

b.  All amounts by which KDW, Henry Kelly and Catherine James have been unjustly enriched as a result of their misappropriations of Blitz's trade secrets, and disgorgement of same rom those defendants;

c.  Exemplary damages in an amount not more than two times the amounts awarded under subparagraphs (a) and (b) above;

d.  All reasonable attorneys' fees and costs incurred by Blitz in this litigation; and

e.  All other relief this Court deems just and equitable under the circumstances.

### COUNT X - Illinois Trade Secrets Act
### (Local Access v. KDW, Henry Kelly and Catherine James)

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as though fully restated herein, and further state:

422.    This is an action for remedies under the Illinois Trade Secrets Act, 765 ILCS 1065/1-9 (the "ITSA").

423.    The information contained in the Productions contained proprietary customer information owned by Local Access, including but not limited to the names of Local Access's customers (which constitutes a "list of actual or potential customers," as

that term is used in the ITSA), the names Local Access's customers' customers (which constitutes a "list of actual or potential customers," as that term is used in the ITSA), telephone numbers that could be used to identify Local Access's customers and its customers' customers, routing information, DID volumes, traffic information, and proprietary coding information. Local Access derived independent economic value from the secrecy of this information in that the information could be used by competitors to analyze the volume of DIDs, the minutes of use, the growth or reduction in traffic, the routing information, and other information that would allow competitors to identify which customers and customers' customers of Local Access to target, what services to offer those customers, and where it would be advantageous to provide credits for certain services in order to promote sales of other lucrative services.  The value of the secrecy of this information is evinced, in part, by the losses that Local Access incurred once Peerless obtained and used Local Access's proprietary information to market to Local Access's customers.

424.    The CDRs contained in the Productions also contain proprietary coding information that Plaintiffs developed for ease of sorting and managing the data contained within the CDRs, as well as customized coding that Plaintiffs developed to address specific requests of their customers.  The creation and use of these codes, and the codes themselves, are not industry practice and standard, and are unique developments that Plaintiffs use to analyze their own status with customers and financial standing, as well as to market to their existing and potential customers. Plaintiffs' willingness and ability to provide customized coding for customers provide Plaintiffs with a marketing advantage over larger carriers and aggregators, thereby

providing Plaintiffs with independent economic value through the secrecy of that information.

425.    The nature of the proprietary information at issue is set forth in more detail in paragraphs 44 through 72, above.

426.    The information contained in the May 2018 Production also contained confidential contracts between Local Access and it customers. Within those contracts was trade secret information, including but not limited to customer identifications, types of traffic provided for those customers, pricing information, expected and minimum traffic levels, contract durations and other contract terms that would provide Local Access's customers with the ability to target Local Access's customers and to analyze the services, pricing and terms to offer those customers so as to undercut Local Access and take Local Access's customers.

427.    This proprietary information constitutes information that Local Access has taken reasonable measures to keep secret.

428.    This proprietary information derives independent economic value to Local Access in that it is not generally known to Local Access's competitors, is not readily ascertainable by Local Access's competitors by proper means, and Local Access's competitors could obtain economic value from the disclosure or use of the information. The economic value that Local Access derives is evinced, in part, by the losses Local Access suffered as a direct result of Peerless's acquisition and use of the proprietary information contained in the Productions.

429.    Because Local Access makes significant efforts to maintain the secrecy of the described proprietary information, and derives economic benefit from the

maintenance of the secrecy of the information, this proprietary information constitutes trade secrets under the ITSA.

430.   Local Access refused to disclose the proprietary information to KDW, Henry Kelly and Catherine James until a court of competent jurisdiction ordered Local Access to produce the proprietary information within the terms of a valid Protective Order.

431.   Local Access designated the December 2017 Production as Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for KDW, Henry Kelly and Catherine James to maintain the secrecy of Local Access's trade secrets and limit the use of Local Access's trade secrets.

432.   Local Access designated the January 2018 Production, the April 2018 Production and the May 2018 Production as Highly Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for KDW, Henry Kelly and Catherine James to maintain the secrecy of Local Access's trade secrets and limit the use of Local Access's trade secrets.

433.   Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James provided Local Access's trade secrets to Peerless and its employees (including but not limited to Bob Sherman, Scott Kell, John Barnicle and Richard Knight) in direct violation of the obligation of secrecy and the limitation of use that KDW, Henry Kelly and Catherine James all knew to exist relative to Confidential and Highly

Confidential designated information. This disclosure was not permissible in or related to the litigation of Case III.

434.   Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James used Local Access's trade secrets in direct violation of the limitations of use that KDW, Henry Kelly and Catherine James all knew to exist relative to Confidential and Highly Confidential designated information. This use was not permissible in or related to the litigation of Case III.

435.   At the time that KDW, Henry Kelly and Catherine James disclosed and used Local Access's protected trade secrets, they each knew or had reason to know that the information was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and limiting the use of the trade secrets.

436.   The disclosure and use of Local Access's trade secrets by KDW, Henry Kelly and Catherine James constituted one or more misappropriations of the trade secrets under the ITSA.

437.   Even while and after the parties litigated the "Sanctions Phase" in Case III, KDW, Henry Kelly and Catherine James conspired with Peerless to conceal and assist Peerless's marketing to Local Access's customers and customers' customers by allowing Peerless to use the proprietary information contained within the Productions and by failing to implement the safeguards against such use that they represented would be put in place.  These actions were not permissible in or related to the litigation of Case III.

438.   Even while and after the parties litigated the "Sanctions Phase" in Case III, KDW, Henry Kelly and Catherine James conspired with Peerless to conceal and assist

Peerless's efforts to steal Local Access's customers and customers' customers, and to convert their business for the use and benefit of Peerless and its affiliates and subsidiaries, failing to implement the safeguards against such use that they represented would be put in place.  These actions were not permissible in or related to the litigation of Case III.

439.   Each instance of marketing to Local Access's customers and customers' customers using Blitz's proprietary information constituted a separate and independent misappropriation of Local Access's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

440.   Each instance of entering into a contract with Local Access's customers and customers' customers as the result of marketing efforts that used Local Access's proprietary information constituted a separate and independent misappropriation of Local Access's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

441.   Each instance of porting numbers that belonged to Local Access's customers and customers' customers as the result of marketing efforts that used Local Access's proprietary information constituted a separate and independent misappropriation of Local Access's trade secrets which was the object of the conspiracy between KDW, Henry James, Catherine James, Peerless, and Richard Knight, or any of them.

442.   As a direct and proximate result of the use and disclosure of Local
Access's trade secrets by KDW, Henry Kelly and Catherine James, Local Access has
suffered actual damages of the following nature:

a.  Peerless and its Executive Vice President of Sales and Marketing,
Richard Knight, used the trade secrets it received from KDW, Henry
Kelly and Catherine James to steal Local Access's customers, Local
Access's customers' customers, Local Access's traffic, and/or Local
Access's customers' traffic; all of which resulted in lost revenue for
Local Access.

b.  Peerless and its employees, including Richard Knight, Bob Sherman
and Scott Kell, worked with KDW and Catherine James to analyze
Local Access's trade secrets for more effective marketing to Local
Access's customers and Local Access's customers' customers,
resulting in the loss of revenue for Local Access.

c.  KDW, Peerless and their respective employees have used Local
Access's trade secrets, which KDW, Henry Kelly and Catherine James
used and disclosed to Peerless, to solicit Local Access's customers
and to involve or try to involve those customers in litigation, so as to
drive customers and traffic away from Local Access, even when those
customers have not moved to Peerless; all of which resulted in lost
revenue for Local Access.

d.  Peerless used the trade secrets it received from KDW, Henry Kelly and
Catherine James, and Peerless's misconstruction of that information,

to terminate its contract with Local Access wrongfully and prematurely, resulting in significant monetary loss to Local Access.  But for KDW, Henry Kelly and Catherine James providing Local Access's trade secrets to Peerless improperly, Peerless would not have terminated the contract prematurely.

e.  The stay of Case III, which has lasted for more than two years, would not have occurred but for the misappropriation of Local Access's and Blitz's trade secrets by KDW, Henry Kelly and Catherine James.  That stay has resulted in the expiration of most, and perhaps all, of the remaining period that Local Access had on its contract with Peerless. Thus, Local Access has lost the benefit of its contract with Peerless as a result of the misappropriations by KDW, Henry Kelly and Catherine James.

f.  The stay of Case III for prosecution of the sanctions arising from KDW's and Peerless's violations of the Protective Order have caused Local Access to incur attorneys' fees and litigation expenses that it would not have otherwise incurred.  While some of these fees and costs may be recovered in the sanctions phase of Case III, any fees and costs that are not recovered in that proceeding would be recoverable in this action as consequential damages.

443.   In addition, KDW has been unjustly enriched by its disclosure and use of Local Access's trade secrets in that the violations of the protective order by KDW, Henry Kelly, Catherine James, Peerless and Richard Knight have been the subject of

sanctions motions in Case III that has been on-going for more than three years, all of which time KDW has been compensated by Peerless for representation in those proceedings.  Absent the improper disclosure and use of Local Access's trade secrets, Case III would not have been stayed and KDW would not have received the fees and/or compensation from Peerless that it has received since June 2018 relative to the litigation of the sanctions issues.  The fees and/or compensation, by which KDW has been unjustly enriched, should be disgorged and awarded to Local Access pursuant to 765 ILCS 1065/4(a).

444.    KDW, Henry Kelly and Catherine James misappropriated Local Access's trade secrets willfully and maliciously, such that exemplary damages are appropriate under 765 ILCS 1065/4(b).

445.    KDW, Henry Kelly and Catherine James misappropriated Local Access's trade secrets willfully and maliciously, such that Local Access is entitled to an award of its reasonable attorneys' fees upon prevailing in this action, pursuant to 765 ILCS 1065/5.

WHEREFORE, LOCAL ACCESS, LLC demands entry of a judgment awarding the following:

a. All actual losses and expenses incurred by Local Access as a result of the misappropriation of Local Access's trade secrets by KDW, Henry Kelly and Catherine James, with joint and several liability for such damages;

b. All amounts by which KDW, Henry Kelly and Catherine James have been unjustly enriched as a result of their misappropriations of Local Access's trade secrets, and disgorgement of same from those defendants;

c. Exemplary damages in an amount not more than two times the amounts awarded under subparagraphs (a) and (b) above;

d. All reasonable attorneys' fees and costs incurred by Local Access in this litigation; and

e. All other relief this Court deems just and equitable under the circumstances.

**COUNT XI – Illinois Uniform Trade Secrets Act**
**(Blitz v. Peerless and Richard Knight)**

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as though fully restated herein, and further state:

446.   This is an action for remedies under the Illinois Trade Secrets Act, 765 ILCS 1065/1-9 (the "ITSA").

447.   The information contained in the Productions contained proprietary customer information owned by Blitz (which constitutes a "list of actual or potential customers," as that term is used in the ITSA), including but not limited to the names of Blitz's customers (which constitutes a "list of actual or potential customers," as that term is used in the ITSA), the names of Blitz's customers' customers, telephone numbers that could be used to identify Blitz's customers and their customers' customers, routing information, DID volumes, traffic information, and proprietary coding information.  Blitz derived independent economic value from the secrecy of this information in that the information could be used by competitors to analyze the volume of DIDs, the minutes of use, the growth or reduction in traffic, the routing information, and other information that would allow competitors to identify which of Blitz's customers to target, what services to offer those customers, and where it would be advantageous to provide credits for certain services in order to promote sales of other lucrative services.  The value of the

secrecy of this information is evinced, in part, by the losses that Blitz incurred once

Peerless obtained and used Blitz's proprietary information to market to Blitz's

customers.

448.    The CDRs contained in the Productions also contain proprietary coding

information that Plaintiffs developed for ease of sorting and managing the data

contained within the CDRs, as well as customized coding that Plaintiffs developed to

address specific requests of their customers.  The creation and use of these codes, and

the codes themselves, are not industry practice and standard, and are unique

developments that Plaintiffs use to analyze their own status with customers and

financial standing, as well as to market to their existing and potential customers.

Plaintiffs' willingness and ability to provide customized coding for customers provide

Plaintiffs with a marketing advantage over larger carriers and aggregators, thereby

providing Plaintiffs with independent economic value through the secrecy of that

information.

449.    The nature of the proprietary information at issue is set forth in more detail

in paragraphs 44 through 72, above.

450.    The proprietary information contained in the Productions constitutes

information that Blitz has taken reasonable measures to keep secret.

451.    This proprietary information derives independent economic value to Blitz

in that it is not generally known to Blitz's competitors, is not readily ascertainable by

Blitz's competitors by proper means, and Blitz's competitors could obtain economic

value from the disclosure or use of the information.  The economic value that Blitz

derives is evinced, in part, by the losses Blitz suffered as a direct result of Peerless's

acquisition and use of the proprietary information contained in the Productions, including the loss of business and the loss of resale value of Blitz's accounts.

452.   Because Blitz makes significant efforts to maintain the secrecy of the described proprietary information, and derives economic benefit from the maintenance of the secrecy of the information, this proprietary information constitutes trade secrets under the ITSA.

453.   Local Access refused to disclose the proprietary information to Peerless, its employees or its counsel until a court of competent jurisdiction ordered Local Access to produce the proprietary information within the terms of a valid Protective Order.

454.   Local Access, who lawfully had Blitz's trade secrets and who was required to maintain its secrecy,  designated the December 2017 Production as Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for Peerless and its employees, including but not limited to Richard Knight, to maintain the secrecy of Blitz's trade secrets and limit the use of Blitz's trade secrets.

455.   Local Access designated the January 2018 Production and April 2018 Production as Highly Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order would preclude Peerless and its employees from obtaining Blitz's trade secrets from Peerless's counsel.

456.   Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James, Peerless's agents and representatives, provided Blitz's proprietary information to Peerless and its employees (including but not limited to Bob Sherman, Scott Kell, John Barnicle and Richard Knight) in direct violation of the obligation of

secrecy and the limitation of use that KDW, Henry Kelly and Catherine James all knew to exist relative to Confidential and Highly Confidential designated information. This disclosure was not permissible in or related to the litigation of Case III.

457.   At the time they acquired Blitz's trade secrets that had been designated as Highly Confidential, Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, knew or had reason to know that the Protective Order precluded them from acquiring those trade secrets.  Thus, Peerless and its employees knew or had reason to know that they were acquiring Blitz's trade secrets by improper means.

458.   Upon acquiring Blitz's trade secrets, Peerless and its employees, including but not limited to Bob Sherman and Scott Kell, used the information in direct violation of the limitations of use that Peerless and its employees knew or had reason to know were in place under the Protective Order. This use was not permissible in or related to the litigation of Case III.

459.   Peerless and its employees, including Bob Sherman and Scott Kell, worked in conjunction with KDW and Catherine James to analyze Blitz's trade secrets, when all of them knew or had reason to know that Peerless and its employees should not see or be in possession of those trade secrets. This use was not permissible in or related to the litigation of Case III.

460.   Upon acquiring Blitz's trade secrets from KDW and Catherine James, Peerless and Richard Knight used those trade secrets to market to Blitz's customers and customers' customers. This use was not permissible in or related to the litigation of Case III.

461.    Peerless and Richard Knight worked in conjunction with KDW and Catherine James to analyze Blitz's trade secrets and to use those trade secrets for illegal and improper means.  This use was not permissible in or related to the litigation of Case III.

462.    Richard Knight, as Executive Vice President of Sales and Marketing for Peerless, and in furtherance of his personal pecuniary interests, further disclosed Blitz's trade secrets to other Peerless employees, including but not limited to Brian Brabson, Margaret McNerney and Jeff Davis. This disclosure was not permissible in or related to the litigation of Case III.

463.    At the time that Richard Knight disclosed Blitz's trade secrets to other Peerless employees, he knew or had reason to know that he owed a duty to maintain the secrecy of the trade secrets and to limit their use.

464.    The disclosure and use of Blitz's trade secrets by Peerless and Richard Knight constituted one or more misappropriations of the trade secrets under the ITSA.

465.    Even while and after the parties litigated the "Sanctions Phase" in Case III, Peerless continued to market to Blitz's customers and customers' customers by using the proprietary information contained within the Productions.  This use was not permissible in or related to the litigation of Case III.

466.    Even while and after the parties litigated the "Sanctions Phase" in Case III, Peerless continued to steal Blitz's customers and customers' customers, and to convert their business for the use and benefit of Peerless and its affiliates and subsidiaries, by using the proprietary information contained within the Productions.  This use was not permissible in or related to the litigation of Case III.

467.   Each instance of marketing to Blitz's customers and customers' customers using Blitz's proprietary information constituted a separate and independent misappropriation of Blitz's trade secrets by Peerless and Richard Knight.

468.   Each instance of entering into a contract with Blitz's customers and customers' customers as the result of marketing efforts that used Blitz's proprietary information constituted a separate and independent misappropriation of Blitz's trade secrets by Peerless and Richard Knight.

469.   Each instance of porting numbers that belonged to Blitz's customers and customers' customers as the result of marketing efforts that used Blitz's proprietary information constituted a separate and independent misappropriation of Blitz's trade secrets by Peerless and Richard Knight.

470.   As a direct and proximate result of the use and disclosure of Blitz's trade secrets by Peerless and Richard Knight, Blitz has suffered actual damages of the following nature:

   a.   Peerless and Richard Knight used the trade secrets to steal Blitz's customers, Blitz's customers' customers, Blitz's traffic, and/or Blitz's customers' traffic; all of which resulted in lost revenue for Blitz.

   b.   Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, worked with KDW and Catherine James to analyze Blitz's trade secrets for more effective marketing to Blitz's customers and Blitz's customers' customers, resulting in the loss of revenue for Blitz.

      c.  Peerless and Richard Knight used Blitz's trade secrets to solicit Blitz's customers and to involve or try to involve those customers in litigation, so as to drive customers and traffic away from Blitz, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Blitz.

      d.  When Blitz entered into the Valor APA, which would have sold Blitz assets (including customer contracts) for nearly $15 Million, the purchaser terminated the agreement for the sole reason that Peerless and Richard Knight were using Blitz's trade secrets to market to customers whose contracts were part of the sale.

471.   Peerless has been unjustly enriched by its and Richard Knight's disclosure and use of Blitz's trade secrets in that Peerless has received additional customers, traffic and revenue that it would not have received but for the misappropriation of Blitz's and Local Access's trade secrets.  The additional revenue that Peerless has received as the result of its and Richard Knight's misappropriations should be disgorged and awarded to Blitz pursuant to 765 ILCS 1065/4(a).

472.   Richard Knight has been unjustly enriched by his and Peerless's disclosure and use of Blitz's trade secrets in that he has received compensation, performance bonuses, dividends, increases in stock value, and other pecuniary gain as a result of the traffic and revenue that Peerless obtained from using Blitz's trade secrets.  The additional revenue that Richard Knight has received as the result of his and Peerless's misappropriations should be disgorged and awarded to Blitz pursuant to 765 ILCS 1065/4(a).

473.    Peerless and Richard Knight misappropriated Blitz's trade secrets willfully and maliciously, such that exemplary damages are appropriate under 765 ILCS 1065/4(b).

474.    Peerless and Richard Knight misappropriated Blitz's and Local Access's trade secrets willfully and maliciously, such that Blitz is entitled to an award of its reasonable attorneys' fees upon prevailing in this action, pursuant to 765 ILCS 1065/5.

WHEREFORE, BLITZ TELECOM CONSULTING, LLC demands entry of a judgment awarding the following:

a.  All actual losses incurred by Blitz as a result of the misappropriation of Blitz's trade secrets by Peerless and Richard Knight, with joint and several liability for such damages;

b.  All amounts by which Peerless and Richard Knight have been unjustly enriched as a result of their misappropriations of Blitz's trade secrets, and disgorgement of same from those defendants;

c.  Exemplary damages in an amount not more than two times the amounts awarded under subparagraphs (a) and (b) above;

d.  All reasonable attorneys' fees and costs incurred by Blitz in this litigation; and

e.  All other relief this Court deems just and equitable under the circumstances.

## COUNT XII - Illinois Uniform Trade Secrets Act
### (Local Access v. Peerless and Richard Knight)

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as though fully restated herein, and further state:

475.    This is an action for remedies under the Illinois Trade Secrets Act, 765 ILCS 1065/1-9 (the "ITSA").

476.   The information contained in the Productions contained proprietary customer information owned by Local Access, including but not limited to the names of Local Access's customers (which constitutes a "list of actual or potential customers," as that term is used in the ITSA),, the names of Local Access's customers' customers (which constitutes a "list of actual or potential customers," as that term is used in the ITSA), telephone numbers that could be used to identify Local Access's customers and its customers' customers, routing information, DID volumes, traffic information, and proprietary coding information.

477.   Local Access derived independent economic value from the secrecy of this information in that the information could be used by competitors to analyze the volume of DIDs, the minutes of use, the growth or reduction in traffic, the routing information, and other information that would allow competitors to identify which of Local Access's customers to target, what services to offer those customers, and where it would be advantageous to provide credits for certain services in order to promote sales of other lucrative services.  The value of the secrecy of this information is evinced, in part, by the losses that Local Access incurred once Peerless obtained and used Local Access's proprietary information to market to Local Access's customers.

478.   The CDRs contained in the Productions also contain proprietary coding information that Plaintiffs developed for ease of sorting and managing the data contained within the CDRs, as well as customized coding that Plaintiffs developed to address specific requests of their customers.  The creation and use of these customized codes, and the codes themselves, are not industry practice and standard, and are unique developments that Plaintiffs use to market to their existing and potential

customers.  Plaintiffs' willingness and ability to provide customized coding for customers provide Plaintiffs with a marketing advantage over larger carriers and aggregators, thereby providing Plaintiffs with independent economic value through the secrecy of that information.

479.   The nature of the proprietary information at issue is set forth in more detail in paragraphs 44 through 72, above.

480.   The CDRs also contained codes that are specific to proprietary processes for routing traffic, which if mined and understood by Local Access's competitors, could result in the development of competing processes and programs by competing carriers.

481.   The information contained in the May 2018 Production also contained confidential contracts between Local Access and it customers.  Within those contracts was trade secret information, including but not limited to customer identifications, types of traffic provided for those customers, pricing information, expected and minimum traffic levels, contract durations and other contract terms that would provide Local Access's customers with the ability to target Local Access's customers and to analyze the services, pricing and terms to offer those customers so as to undercut Local Access and take Local Access's customers.

482.   The proprietary information contained in the Productions is information that Local Access has taken reasonable measures to keep secret.

483.   This proprietary information derives independent economic value to Local Access in that it is not generally known to Local Access's competitors, is not readily ascertainable by Local Access's competitors by proper means, and Local Access's competitors could obtain economic value from the disclosure or use of the information.

The economic value that Local Access derives is evinced, in part, by the losses Local Access suffered as a direct result of Peerless's acquisition and use of the proprietary information contained in the Productions, including the loss of business and the loss of resale value of Local Access's accounts.

484.   Because Local Access makes significant efforts to maintain the secrecy of the described proprietary information, and derives economic benefit from the maintenance of the secrecy of the information, this proprietary information constitutes trade secrets under the ITSA.

485.   Local Access refused to disclose the proprietary information to Peerless, its employees or its counsel until a court of competent jurisdiction ordered Local Access to produce the proprietary information within the terms of a valid Protective Order.

486.   Local Access designated the December 2017 Production as Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order created an obligation for Peerless and its employees, including but not limited to Richard Knight, to maintain the secrecy of Local Access's trade secrets and limit the use of Local Access's trade secrets.

487.   Local Access designated the January 2018 Production, the April 2018 Production and the May 2018 Production as Highly Confidential pursuant to the terms of the Protective Order, with the knowledge and understanding that the Protective Order would preclude Peerless and its employees from obtaining Local Access's trade secrets from Peerless's counsel.

488.   Upon acquiring the Productions from Local Access, KDW, Henry Kelly and Catherine James, Peerless's agents and representatives, provided Local Access's

proprietary information to Peerless and its employees (including but not limited to Bob Sherman, Scott Kell, John Barnicle and Richard Knight) in direct violation of the obligation of secrecy and the limitation of use that KDW, Henry Kelly and Catherine James all knew to exist relative to Confidential and Highly Confidential designated information.  This dissemination of Local Access's proprietary information was not permissible in or related to the litigation of Case III.

489.   At the time they acquired Local Access's trade secrets that had been designated as Highly Confidential, Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, knew or had reason to know that the Protective Order precluded them from acquiring those trade secrets.  Thus, Peerless and its employees knew or had reason to know that they were acquiring Local Access's trade secrets by improper means.

490.   Upon acquiring Local Access's trade secrets, Peerless and its employees, including Bob Sherman and Scott Kell, used the information in direct violation of the limitations of use that Peerless and its employees knew or had reason to know were in place under the Protective Order.  This use was not permissible in or related to the litigation of Case III.

491.   Peerless and its employees, including Bob Sherman and Scott Kell, worked in conjunction with KDW and Catherine James to analyze Local Access's trade secrets, when all of them knew or had reason to know that Peerless and its employees should not see or be in possession of those trade secrets. This use was not permissible in or related to the litigation of Case III.

492.    Upon acquiring Local Access's trade secrets from KDW and Catherine James, Peerless and Richard Knight used those trade secrets to market to Local Access's customers and customers' customers. This use was not permissible in or related to the litigation of Case III.

493.    Peerless and Richard Knight worked in conjunction with KDW and Catherine James to analyze Local Access's trade secrets and to use those trade secrets for illegal and improper means.

494.    Richard Knight, as Executive Vice President of Sales and Marketing for Peerless, and in furtherance of his personal pecuniary interests, further disclosed Local Access's trade secrets to other Peerless employees, including but not limited to Brian Brabson, Margaret McNerney and Jeff Davis. This disclosure was not permissible in or related to the litigation of Case III.

495.    At the time that Richard Knight disclosed Local Access's trade secrets to other Peerless employees, he knew or had reason to know that he owed a duty to maintain the secrecy of the trade secrets and to limit their use.

496.    The disclosure and use of Local Access's trade secrets by Peerless and Richard Knight constituted one or more misappropriations of the trade secrets under the ITSA.

497.    Even after Plaintiffs moved for sanctions against Peerless in Case III, Peerless and Richard Knight marketed to Local Access's customers and customers' customers by using information derived from the Productions and from records Peerless gathered for the provision of telecommunications services.  This use of Local Access's proprietary information was not permissible in or related to the litigation of Case III.

498.    Even after Plaintiffs moved for sanctions against Peerless in Case III, Peerless and Richard Knight sold services to Local Access's customers and customers' customers by using information derived from the Productions and from records Peerless gathered for the provision of telecommunications services. This use of Local Access's proprietary information was not permissible in or related to the litigation of Case III.

499.    Even after Plaintiffs moved for sanctions against Peerless in Case III, Peerless and Richard Knight stole customers and traffic from Local Access, for Peerless and its affiliates and subsidiaries, by using information derived from the Productions and from records Peerless gathered for the provision of telecommunications services. This use of Local Access's proprietary information was not permissible in or related to the litigation of Case III.

500.    As a direct and proximate result of the use and disclosure of Local Access's trade secrets by Peerless and Richard Knight, Local Access has suffered actual damages of the following nature:

   a.   Peerless and Richard Knight used the trade secrets to steal Local Access's customers, Local Access's customers' customers, Local Access's traffic, and/or Local Access's customers' traffic; all of which resulted in lost revenue for Local Access.

   b.   Peerless and its employees, including Richard Knight, Bob Sherman and Scott Kell, worked with KDW and Catherine James to analyze Local Access's trade secrets for more effective marketing to Local Access's customers and Local Access's customers' customers, resulting in the loss of revenue for Local Access.

c.  Peerless and Richard Knight used Local Access's trade secrets to solicit Local Access's customers and to involve or try to involve those customers in litigation, so as to drive customers and traffic away from Local Access, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Local Access.

d.  Peerless used the trade secrets it received from KDW, Henry Kelly and Catherine James, and misconstrued that information, to terminate its contract with Local Access wrongfully and prematurely, resulting in significant monetary loss to Local Access.  But for Peerless's misappropriation of Local Access's trade secrets, Peerless would not have terminated the contract prematurely.

e.  The stay of Case III, which has lasted for more than three years, would not have occurred but for the misappropriation of Local Access's and Blitz's trade secrets by Peerless and Richard Knight.  That stay has resulted in the expiration of most, and perhaps all, of the remaining period that Local Access had on its contract with Peerless.  Thus, Local Access has lost the benefit of its contract with Peerless as a result of the misappropriations by Peerless and Richard Knight.

f.  The stay of Case III for prosecution of the sanctions arising from KDW's and Peerless's violations of the Protective Order have caused Local Access to incur attorneys' fees and litigation expenses that it would not have otherwise incurred.  While some of these fees and costs may be recovered in the sanctions phase of Case III, any fees

and costs that are not recovered in that proceeding would be

recoverable in this action as consequential damages.

501.    In addition, Peerless has been unjustly enriched by its and Richard

Knight's disclosure and use of Local Access's trade secrets in that Peerless has

received additional customers, traffic and revenue that it would not have received but for

the misappropriation of Local Access's trade secrets.  The additional revenue that

Peerless has received as the result of its and Richard Knight's misappropriations should

be disgorged and awarded to Local Access pursuant to 765 ILCS 1065/4(a).

502.    Richard Knight has been unjustly enriched by his and Peerless's

disclosure and use of Local Access's trade secrets in that he has received

compensation, performance bonuses, dividends, increases in stock value, and other

pecuniary gain as a result of the traffic and revenue that Peerless obtained from using

Local Access's trade secrets.  The additional revenue that Richard Knight has received

as the result of his and Peerless's misappropriations should be disgorged and awarded

to Local Access pursuant to 765 ILCS 1065/4(a).

503.    Peerless and Richard Knight misappropriated Local Access's trade

secrets willfully and maliciously, such that exemplary damages are appropriate under

765 ILCS 1065/4(b).

504.    Peerless and Richard Knight misappropriated Local Access's trade

secrets willfully and maliciously, such that Local Access is entitled to an award of its

reasonable attorneys' fees upon prevailing in this action, pursuant to 765 ILCS 1065/5.

WHEREFORE, LOCAL ACCESS, LLC demands entry of a judgment awarding

the following:

a. All actual losses and expenses incurred by Local Access as a result of the misappropriation of Local Access's trade secrets by Peerless and Richard Knight, with joint and several liability for such damages;

b. All amounts by which Peerless and Richard Knight have been unjustly enriched as a result of their misappropriations of Local Access's trade secrets, and disgorgement of same from those defendants;

c. Exemplary damages in an amount not more than two times the amounts awarded under subparagraphs (a) and (b) above;

d. All reasonable attorneys' fees and costs incurred by Local Access in this litigation; and

e. All other relief this Court deems just and equitable under the circumstances.

### <u>COUNT XIII – Telecommunications Act – §222(b)</u>
**(Blitz v. Peerless)**

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as though fully restated herein, and further state:

505.   This action is brought pursuant to the Telecommunications Act, 47 U.S.C. §201, *et seq.,* including but not limited to §§206, 207 and 222(b).

506.   Section 222 of the Act provides, in pertinent part:

(a)    IN GENERAL.-- Every telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to, other telecommunication carriers, equipment manufacturers, and customers, including telecommunication carriers reselling telecommunications services provided by a telecommunications carrier.

(b)    CONFIDENTIALITY OF CARRIER INFORMATION.-- A telecommunications carrier that receives or obtains proprietary information from another carrier for purposes of providing any telecommunications service shall use such information only for such purpose, and shall not use such information for its own marketing efforts.

507.    While employed by KDW and under the direct supervision of Henry Kelly, Catherine James made an erroneous, conscious determination that Peerless could gather its own information to use in deciphering and analyzing Local Access's CDRs.

508.    Having reached this conclusion, James requested that Peerless personnel use Peerless's own records, which had been obtained during and for the provision of telecommunications services, to analyze and decipher the Local Access records that Peerless later used for marketing purposes.

509.    In February 2018, James expressly requested that Knight have other Peerless employees review Peerless's own information on Local Access customers, which Peerless had obtained during and for the provision of telecommunication services, for the analysis and deciphering of the CDRs Local Access was required to produce through discovery in Case III.

510.    The information derived from this analysis and deciphering was then later used by Peerless for marketing purposes in violation of §222(b) of the Telecommunications Act.

511.    In February or March of 2018, James also instructed Peerless employees, Bob Sherman and Scott Kell, to utilize Peerless's own records, including but not limited to its own CDRs, to compare telephone numbers, customer names, traffic information and other information to Local Access's CDRs, so as to use Peerless's own information collected through the provision of telecommunications services as a "Rosetta Stone" to decipher and analyze Local Access's CDRs.

512.    Peerless employees then compared Peerless's own records, including but not limited to its own CDRs, to the telephone numbers, customer names, traffic

information and other information in Local Access's CDRs to identify Blitz's and Local Access's customers, customer traffic, customer volumes and other protected information for Peerless to use in its own marketing efforts.

513.    The information from Peerless's records that Peerless compared to Local Access's proprietary information contained carrier proprietary information ("CPI"), as described in section 222(b) of the Telecommunications Act, that Peerless received or obtained from Local Access and/or other carriers for the purpose of providing telecommunications services.

514.    Peerless used the CPI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for purposes other than the litigation of Case III.

515.    Peerless used the CPI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for purposes other than the provision of telecommunications services.

516.    Peerless used the CPI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for its own marketing efforts.

517.    Peerless's actions were violative of the Telecommunications Act in that Peerless used CPI, which Peerless received or obtained through its provision of telecommunication services, to market to Blitz's customers and Blitz's customers' customers, to gain an advantage against Blitz in civil litigation, and to seek a means of

terminating its contractual obligations to Blitz's carrier, Local Access. Such uses were violative of §222(b), which prohibits a telecommunications carrier from using CPI for any purpose other than the provision of telecommunication service, and explicitly prohibits use of "such information for its own marketing efforts."

518.    Pursuant to §206 of the Telecommunications Act, Peerless is liable to Blitz for its violative and unlawful acts for the full amount of the damages sustained by Blitz as a consequence of Peerless's violative and unlawful acts, together with a reasonable attorneys' fee.

519.    Pursuant to §207 of the Telecommunications Act, Blitz has a right of action to bring suit against Peerless for the damages Blitz incurred as a result of Peerless's violation of §222(b), regardless of whose CPI Peerless used to harm Blitz.

520.    Blitz first discovered Peerless's comparison of the CPI in Peerless's records to the CPI in Local Access's records on February 25, 2019, when Catherine James testified that she had formulated the idea to make the comparison and that Peerless had done it.

521.    Blitz first discovered that Peerless used the comparison of the CPI in Peerless's records to the CPI in Local Access's records on October 22, 2019, when Richard Knight gave testimony establishing that Peerless marketed to at least one customer who was the subject of Peerless's comparison of its own records and Local Access's January 2018 Production, as described herein, was part of Peerless's marketing efforts in February and March of 2018.

522.    Prior to October 22, 2019, Peerless and KDW had repeatedly asserted that only the December 2017 Production had been used for Peerless's marketing efforts

and that the December 2017 Production had not been compared to Peerless's own records.

523.    With Richard Knight's testimony on October 22, 2019 that established Peerless's use of the January 2018 Production for its own marketing efforts, Blitz first discovered the basis for a cause of action under the Telecommunications Act relative to Peerless's improper marketing efforts prior to July 2018.  Prior to this testimony from Richard Knight, Blitz could not have discovered through reasonable diligence the basis for a cause of action under the Telecommunications Act relative to Peerless's improper marketing efforts that occurred before July 2018.

524.    In April 2020, Blitz first discovered that Peerless was still using the CPI described herein for Peerless's marketing efforts and that it was still using that CPI to steal Blitz's customers.  It was at this time that Blitz discovered the basis for a cause of action under the Telecommunications Act relative to Peerless's improper marketing efforts that occurred beyond June 2018.

525.    Prior to April 2020, Blitz could not have discovered through reasonable diligence the basis for a cause of action under the Telecommunications Act relative to Peerless's improper marketing efforts that occurred beyond June 2018.

526.    As a direct and proximate result of Peerless's improper and violative use of CPI, as described herein, Blitz has suffered actual damages of the following nature:

      a.    Peerless used CPI to steal Blitz's customers, Blitz's customers' customers, Blitz's traffic, and Blitz's customers' traffic; all of which resulted in lost revenue for Blitz.

b. Peerless worked with KDW and Catherine James to analyze carrier proprietary information, which Peerless received or obtained by virtue of its provision of telecommunication services, for more effective marketing to Blitz's customers and Blitz's customers' customers, resulting in the loss of revenue for Blitz.

c. Peerless used CPI to solicit Blitz's customers and to involve those customers in Peerless's litigation, so as to drive customers and traffic away from Blitz, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Blitz.

d. Peerless used CPI to gain an advantage over Blitz in the litigation of Case III and other litigation, thereby causing Blitz to incur damages, attorneys' fees and costs that Blitz would not have incurred but for Peerless's violative use of CPI.

e. When Blitz entered into the Valor APA, which would have sold Blitz assets (including customer contracts) for nearly $15 Million, the purchaser terminated the agreement because Peerless was using CPI to market to customers whose contracts were part of the sale.

WHEREFORE, BLITZ TELECOM CONSULTING, LLC demands entry of a judgment awarding the following:

a. All damages sustained by Blitz as a consequence of Peerless's violations and unlawful acts under §222(b) of the Telecommunications Act;

b. All reasonable attorneys' fees and costs incurred by Blitz in this litigation; and

c.  All other relief this Court deems just and equitable under the circumstances.

### COUNT XIV – Telecommunications Act – §222(c)
### (Blitz v. Peerless)

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as though fully restated herein, and further state:

527.   This action is brought pursuant to the Telecommunications Act, 47 U.S.C. §201, *et seq.,* including but not limited to §§206, 207 and 222(c).

528.   Section 222 of the Act provides, in pertinent part:

(a)   IN GENERAL.-- Every telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to, other telecommunication carriers, equipment manufacturers, and customers, including telecommunication carriers reselling telecommunications services provided by a telecommunications carrier.

     *            *            *

(c)   PRIVACY REQUIREMENTS FOR TELECOMMUNICATIONS CARRIERS.-- Except as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories. . . .

529.   Subsequent subsections of section 222 go on to further describe, define and delimit the term "Customer Proprietary Network Information" ("CPNI"), *i.e.,* individually identifiable customer information that a telecommunications carrier possesses solely by virtue of its carrier-customer relationship. CPNI explicitly includes CDRs, as well as any information on the calling patterns, frequency, locations or practices of an individual customer. Subscriber lists and aggregated (*i.e.,* not individually identifiable) customer information are excluded from the definition of CPNI.

The Federal Communications Commission ("FCC") has interpreted and promulgated regulations implementing these subsections and the requirements of §222(c), delineating the circumstances under which a carrier may use such customer information with or without the customer's consent.

530.    While employed by KDW and under the direct supervision of Henry Kelly, Catherine James made an erroneous, conscious determination that Peerless could gather its own information to use in deciphering and analyzing Local Access's CDRs.

531.    Having reached this conclusion, James requested that Peerless personnel use Peerless's own records, which had been obtained during and for the provision of telecommunications services to carriers and customers, to analyze and decipher the Local Access records that Peerless later used for its own marketing purposes.

532.    In February 2018, James expressly requested that Knight have other Peerless employees review Peerless's own information on Local Access customers, which Peerless had obtained during and for the provision of telecommunication services, for the analysis and deciphering of the CDRs Local Access was required to produce through discovery in Case III.

533.    The information derived from this analysis and deciphering was then later used by Peerless in violation of the prohibitions on use of CPNI in section 222(c) of the Telecommunications Act.

534.    In February or March of 2018, James also instructed Peerless employees, Bob Sherman and Scott Kell, to utilize Peerless's own records, including but not limited to its own CDRs, to compare telephone numbers, customer names, traffic information and other CPNI to Local Access's CDRs, so as to use Peerless's own information

collected through the provision of telecommunications services as a "Rosetta Stone" to decipher and analyze Local Access's CDRs.

535.    Peerless employees then compared Peerless's own records, including but not limited to its own CDRs, to the telephone numbers, customer names, traffic information and other CPNI in Local Access's CDRs to identify Local Access's customers, customer traffic, customer volumes and other protected information for Peerless to use in its own marketing efforts.

536.    The information from Peerless's records that Peerless compared to Local Access's proprietary information contained CPNI, as described in section 222(c) of the Telecommunications Act, that Peerless had received or obtained from carriers and customers for the purpose of providing telecommunications services.

537.    Peerless used the CPNI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for purposes other than the litigation of Case III.

538.    Peerless used the CPNI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for purposes other than the provision of telecommunications services.

539.    Peerless used the CPNI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for purposes other than the provision of the telecommunications services from which such information was derived.

540.   Peerless used the CPNI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for purposes other than the provision of services necessary to, or used in, the provision of telecommunications services, including the publishing of directories.

541.   Peerless used the CPNI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for its own marketing efforts.

542.   Peerless's actions were violative of the Telecommunications Act in the following ways:

a. Peerless's practice of using Blitz's CPNI (as contained in Peerless's own records and in the Local Access CDRs that were deciphered and analyzed using Peerless's own records) for Peerless's own marketing efforts, to market to Blitz's customers and customers' customers, to gain an advantage against Blitz and Local Access in Case III, and to seek a means of terminating its contractual obligations to Blitz's carrier, Local Access, were not just and reasonable, and therefore were unlawful and improper under §201(b) and §222(c) of the Telecommunications Act.

b. Peerless used other parties' CPNI, which Peerless received or obtained through its provision of telecommunication services, to market to Blitz's customers and Blitz's customers' customers, to gain an advantage against Blitz in Case III, and to seek a means of terminating its contractual obligations to Blitz's carrier, Local Access. Such use was violative of §222(c), which

prohibits a telecommunications carrier from using CPNI except under narrowly prescribed circumstances.

543.   Pursuant to §206 of the Telecommunications Act, Peerless is liable to Blitz for its violative and unlawful acts for the full amount of the damages sustained by Blitz as a consequence of Peerless's violative and unlawful acts, together with a reasonable attorneys' fee.

544.   Pursuant to §207 of the Telecommunications Act, Blitz has a right of action to bring suit against Peerless for the damages Blitz incurred as a result of Peerless's violation of §222(c), regardless of whose CPNI Peerless used to harm Blitz.

545.   Blitz first discovered Peerless's comparison of the CPNI in Peerless's records to the CPNI and/or CPI in Local Access's records on February 25, 2019, when Catherine James testified that she had formulated the idea to make the comparison and that Peerless had done it.

546.   Blitz first discovered that Peerless used the comparison of the CPNI in Peerless's records to the CPNI and/or CPI in Local Access's records on October 22, 2019, when Richard Knight gave testimony establishing that Peerless marketed to at least one customer who was the subject of Peerless's comparison of its own records and Local Access's January 2018 Production, as described herein, was part of Peerless's marketing efforts in February and March of 2018.

547.   Prior to October 22, 2019, Peerless and KDW had repeatedly asserted that only the December 2017 Production had been used for Peerless's marketing efforts and that the December 2017 Production had not been compared to Peerless's own records.

548.    With Richard Knight's testimony on October 22, 2019 that established Peerless's use of the January 2018 Production for its own marketing efforts, Blitz first discovered the basis for a cause of action under §222(c) of the Telecommunications Act relative to Peerless's improper marketing efforts prior to July 2018. Prior to this testimony from Richard Knight, Blitz could not have discovered through reasonable diligence the basis for a cause of action under §222(c) of the Telecommunications Act relative to Peerless's improper use of CPNI for marketing efforts that occurred before July 2018.

549.    In April 2020, Blitz first discovered that Peerless was still using the CPNI described herein for Peerless's marketing efforts and that it was still using that CPNI to steal Blitz's customers.  It was at this time that Blitz discovered the basis for a cause of action under §222(c) of the Telecommunications Act relative to Peerless's improper use of CPNI for marketing efforts that occurred beyond June 2018.

550.    Prior to April 2020, Blitz could not have discovered through reasonable diligence the basis for a cause of action under §222(c) of the Telecommunications Act relative to Peerless's improper use of CPNI for marketing efforts that occurred beyond June 2018.

551.    As a direct and proximate result of Peerless's improper and violative use of CPNI, as described herein, Blitz has suffered actual damages of the following nature:

    a.   Peerless used CPNI which Peerless received or obtained by virtue of its provision of telecommunication services, in Peerless's own marketing efforts and to steal Blitz's customers, Blitz's customers'

customers, Blitz's traffic, and Blitz's customers' traffic; all of which resulted in lost revenue for Blitz.

b.   Peerless worked with KDW and Catherine James to analyze CPNI, which Peerless received or obtained by virtue of its provision of telecommunication services, for more effective marketing to Blitz's customers and Blitz's customers' customers, resulting in the loss of revenue for Blitz.

c.   Peerless used CPNI, which Peerless received or obtained by virtue of its provision of telecommunication services, to solicit Blitz's customers and to involve those customers in Peerless's litigation, so as to drive customers and traffic away from Blitz, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Blitz.

d.   Peerless used CPNI, which Peerless received or obtained by virtue of its provision of telecommunication services, to gain an advantage over Blitz in the litigation of Case III and other litigation, thereby causing Blitz to incur damages, attorneys' fees and costs that Blitz would not have incurred but for Peerless's violative use of CPNI.

e.   When Blitz entered into the Valor APA, which would have sold Blitz assets (including customer contracts) for nearly $15 Million, the purchaser terminated the agreement because Peerless was using CPNI to market to customers whose contracts were part of the sale.

WHEREFORE, BLITZ TELECOM CONSULTING, LLC demands entry of a judgment awarding the following:

      d.  All damages sustained by Blitz as a consequence of Peerless's violations and unlawful acts under §222(c) of the Telecommunications Act;

      e.  All reasonable attorneys' fees and costs incurred by Blitz in this litigation; and

      f.  All other relief this Court deems just and equitable under the circumstances.

### COUNT XV – Telecommunications Act - §222(b)
**(Local Access v. Peerless)**

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as though fully restated herein, and further state:

552.   This action is brought pursuant to the Telecommunications Act, 47 U.S.C. §201, *et seq.,* including but not limited to §§206, 207 and 222(b).

553.   Section 222 of the Act provides, in pertinent part:

    (a)    IN GENERAL.-- Every telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to, other telecommunication carriers, equipment manufacturers, and customers, including telecommunication carriers reselling telecommunications services provided by a telecommunications carrier.

    (b)    CONFIDENTIALITY OF CARRIER INFORMATION.-- A telecommunications carrier that receives or obtains proprietary information from another carrier for purposes of providing any telecommunications service shall use such information only for such purpose, and shall not use such information for its own marketing efforts.

554.   While employed by KDW and under the direct supervision of Henry Kelly, Catherine James made an erroneous, conscious determination that Peerless could gather its own information to use in deciphering and analyzing Local Access's CDRs.

555.    Having reached this conclusion, James requested that Peerless personnel use Peerless's own records, which had been obtained during and for the provision of telecommunications services, to analyze and decipher the Local Access records that Peerless later used for marketing purposes.

556.    In February 2018, James expressly requested that Knight have other Peerless employees review Peerless's own information on Local Access customers, which Peerless had obtained during and for the provision of telecommunication services, for the analysis and deciphering of the CDRs Local Access was required to produce through discovery in Case III.

557.    The information derived from this analysis and deciphering was then later used by Peerless for marketing purposes in violation of §222(b) of the Telecommunications Act.

558.    In February or March of 2018, James also instructed Peerless employees, Bob Sherman and Scott Kell, to utilize Peerless's own records, including but not limited to its own CDRs, to compare telephone numbers, customer names, traffic information and other information to Local Access's CDRs, so as to use Peerless's own information collected through the provision of telecommunications services as a "Rosetta Stone" to decipher and analyze Local Access's CDRs.

559.    Peerless employees then compared Peerless's own records, including but not limited to its own CDRs, to the telephone numbers, customer names, traffic information and other information in Local Access's CDRs to identify Local Access's customers, customer traffic, customer volumes and other protected information for Peerless to use in its own marketing efforts.

560.    The information from Peerless's records that Peerless compared to Local Access's proprietary information contained carrier proprietary information ("CPI"), as described in section 222(b) of the Telecommunications Act, that Peerless received or obtained from Local Access and/or other carriers for the purpose of providing telecommunications services.

561.    Peerless used the CPI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for purposes other than the litigation of Case III.

562.    Peerless used the CPI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for purposes other than the provision of telecommunications services.

563.    Peerless used the CPI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for its own marketing efforts.

564.    Peerless's actions were violative of the Telecommunications Act in that Peerless used CPI, which Peerless received or obtained through its provision of telecommunication services, to market to Local Access's customers and Local Access's customers' customers, to gain an advantage against Local Access in civil litigation, and to seek a means of terminating its contractual obligations to Local Access. Such uses were violative of §222(b), which prohibits a telecommunications carrier from using CPI

for any purpose other than the provision of telecommunication service, and explicitly prohibits use of "such information for its own marketing efforts."

565.   Pursuant to §206 of the Telecommunications Act, Peerless is liable to Blitz for its violative and unlawful acts for the full amount of the damages sustained by Blitz as a consequence of Peerless's violative and unlawful acts, together with a reasonable attorneys' fee.

566.   Pursuant to §207 of the Telecommunications Act, Blitz has a right of action to bring suit against Peerless for the damages Blitz incurred as a result of Peerless's violation of §222(b), regardless of whose CPI Peerless used to harm Blitz.

567.   Local Access first discovered Peerless's comparison of the CPI in Peerless's records to the CPI in Local Access's records on February 25, 2019, when Catherine James testified that she had formulated the idea to make the comparison and that Peerless had done it.

568.   Local Access first discovered that Peerless used the comparison of the CPI in Peerless's records to the CPI in Local Access's records on October 22, 2019, when Richard Knight gave testimony establishing that Peerless marketed to at least one customer who was the subject of Peerless's comparison of its own records and Local Access's January 2018 Production, as described herein, was part of Peerless's marketing efforts in February and March of 2018.

569.   Prior to October 22, 2019, Peerless and KDW had repeatedly asserted that only the December 2017 Production had been used for Peerless's marketing efforts and that the December 2017 Production had not been compared to Peerless's own records.

570.    With Richard Knight's testimony on October 22, 2019 that established Peerless's use of the January 2018 Production for its own marketing efforts, Local Access first discovered the basis for a cause of action under the Telecommunications Act relative to Peerless's improper marketing efforts prior to July 2018.  Prior to this testimony from Richard Knight, Local Access could not have discovered through reasonable diligence the basis for a cause of action under the Telecommunications Act relative to Peerless's improper marketing efforts that occurred before July 2018.

571.    In April 2020, Local Access first discovered that Peerless was still using the CPI described herein for Peerless's marketing efforts and that it was still using that CPI to steal Local Access's customers.  It was at this time that Local Access discovered the basis for a cause of action under the Telecommunications Act relative to Peerless's improper marketing efforts that occurred beyond June 2018.

572.    Prior to April 2020, Local Access could not have discovered through reasonable diligence the basis for a cause of action under the Telecommunications Act relative to Peerless's improper marketing efforts that occurred beyond June 2018.

573.    As a direct and proximate result of Peerless's improper and violative use of CPI, as described herein, Local Access has suffered actual damages of the following nature:

> a.   Peerless used CPI to steal Local Access's customers, Local Access's customers' customers, Local Access's traffic, and Local Access's customers' traffic; all of which resulted in lost revenue for Local Access.

b.  Peerless worked with KDW and Catherine James to analyze CPI, which Peerless received or obtained by virtue of its provision of telecommunication services, for more effective marketing to Local Access's customers and Local Access's customers' customers, resulting in the loss of revenue for Local Access.

c.  Peerless used CPI to solicit Local Access's customers and to involve those customers in Peerless's litigation, so as to drive customers and traffic away from Local Access, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Local Access.

d.  Peerless used CPI, which Peerless received or obtained by virtue of its provision of telecommunication services, to steal Local Access's customers, Local Access's customers' customers, Local Access's traffic, and Local Access's customers' traffic; all of which resulted in lost revenue for Local Access.

e.  Peerless worked with KDW and Catherine James to analyze Local Access's and other parties' CPNI, which Peerless received or obtained by virtue of its provision of telecommunication services, for more effective marketing to Local Access's customers and Local Access's customers' customers, resulting in the loss of revenue for Local Access.

f.  Peerless used CPI, which Peerless received or obtained by virtue of its provision of telecommunication services, to solicit Local Access's

customers and to involve those customers in litigation so as to drive customers and traffic away from Blitz, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Local Access.

g.  Peerless used CPI, which Peerless received or obtained by virtue of its provision of telecommunication services, for its own efforts toward marketing to Local Access's customers and customers' customers, which resulted in lost revenue for Local Access.

h.  Peerless used CPI, which Peerless received or obtained by virtue of its provision of telecommunication services, to terminate its contract with Local Access wrongfully and prematurely, resulting in significant monetary loss to Local Access.

i.  Peerless used CPI, which Peerless received or obtained by virtue of its provision of telecommunication services, to gain an advantage over Local Access in the litigation of Case III and other litigation, thereby causing Local Access to incur damages, attorneys' fees and costs that Local Access would not have incurred but for Peerless's violative use of CPI.

j.  The stay of Case III, which lasted for more than three years, would not have occurred but for Peerless's violations of §222(b) of the Telecommunications Act.  That stay resulted in the expiration of all of the remaining period that Local Access had on its contract with Peerless.  Thus, Local Access has lost the benefit of its contract with

Peerless as a result of Peerless's violation of §222(b) of the Telecommunications Act.

k.  The stay of Case III for prosecution of the sanctions arising from Peerless's violations of the Protective Order, which were violative of §222(b) of the Telecommunications Act, has caused Local Access to incur attorneys' fees and litigation expenses that it would not have otherwise incurred.  While some of those fees and costs were recovered in the sanctions phase of Case III, any fees and costs that weare not recovered in that proceeding would be recoverable in this action as damages.

WHEREFORE, LOCAL ACCESS, LLC demands entry of a judgment awarding the following:

a.  All damages sustained by Local Access as a consequence of Peerless's violations and unlawful acts under §222(b) of the Telecommunications Act;

b.  All reasonable attorneys' fees and costs incurred by Local Access in this litigation; and

c.  All other relief this Court deems just and equitable under the circumstances.

## COUNT XVI – Telecommunications Act – §222(c)
### (Local Access v. Peerless)

Plaintiffs adopt and incorporate the allegations of paragraphs 1 through 185, as though fully restated herein, and further state:

574.   This action is brought pursuant to the Telecommunications Act, 47 U.S.C. §201, *et seq.,* including but not limited to §§206, 207 and 222(c).

575.   Section 222 of the Act provides, in pertinent part:

(a)   IN GENERAL.-- Every telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to, other telecommunication carriers, equipment manufacturers, and customers, including telecommunication carriers reselling telecommunications services provided by a telecommunications carrier.

*                    *                    *

(c)   PRIVACY REQUIREMENTS FOR TELECOMMUNICATIONS CARRIERS.-- Except as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories. . . .

576.   Subsequent subsections of section 222 go on to further describe, define and delimit the term "Customer Proprietary Network Information" ("CPNI"), *i.e.,* individually identifiable customer information that a telecommunications carrier possesses solely by virtue of its carrier-customer relationship. CPNI explicitly includes CDRs, as well as any information on the calling patterns, frequency, locations or practices of an individual customer. Subscriber lists and aggregated (*i.e.*, not individually identifiable) customer information are excluded from the definition of CPNI. The Federal Communications Commission ("FCC") has interpreted and promulgated regulations implementing these subsections and the requirements of §222(c), delineating the circumstances under which a carrier may use such customer information with or without the customer's consent.

577.   While employed by KDW and under the direct supervision of Henry Kelly, Catherine James made an erroneous, conscious determination that Peerless could gather its own information to use in deciphering and analyzing Local Access's CDRs.

578.    Having reached this conclusion, James requested that Peerless personnel use Peerless's own records, which had been obtained during and for the provision of telecommunications services to carriers and customers, to analyze and decipher the Local Access records that Peerless later used for its own marketing purposes.

579.    In February 2018, James expressly requested that Knight have other Peerless employees review Peerless's own information on Local Access customers, which Peerless had obtained during and for the provision of telecommunication services, for the analysis and deciphering of the CDRs Local Access was required to produce through discovery in Case III.

580.    The information derived from this analysis and deciphering was then later used by Peerless in violation of the prohibitions on use of CPNI in section 222(c) of the Telecommunications Act.

581.    In February or March of 2018, James also instructed Peerless employees, Bob Sherman and Scott Kell, to utilize Peerless's own records, including but not limited to its own CDRs, to compare telephone numbers, customer names, traffic information and other CPNI to Local Access's CDRs, so as to use Peerless's own information collected through the provision of telecommunications services as a "Rosetta Stone" to decipher and analyze Local Access's CDRs.

582.    Peerless employees then compared Peerless's own records, including but not limited to its own CDRs, to the telephone numbers, customer names, traffic information and other CPNI in Local Access's CDRs to identify Local Access's customers, customer traffic, customer volumes and other protected information for Peerless to use in its own marketing efforts.

583.    The information from Peerless's records that Peerless compared to Local Access's proprietary information contained CPNI, as described in section 222(c) of the Telecommunications Act, that Peerless had received or obtained from carriers and customers for the purpose of providing telecommunications services.

584.    Peerless used the CPNI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for purposes other than the litigation of Case III.

585.    Peerless used the CPNI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for purposes other than the provision of telecommunications services.

586.    Peerless used the CPNI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for purposes other than the provision of the telecommunications services from which such information was derived.

587.    Peerless used the CPNI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for purposes other than the provision of services necessary to, or used in, the provision of telecommunications services, including the publishing of directories.

588.    Peerless used the CPNI from its own records, as well as the reports and spreadsheets Peerless created when deciphering and analyzing Local Access's CDRs through the use of Peerless's own records, for its own marketing efforts.

589.    Peerless's actions were violative of the Telecommunications Act in the following ways:

a. Peerless's practice of using Local Access's CPNI (as contained in Peerless's own records and in the Local Access CDRs that were deciphered and analyzed using Peerless's own records) for Peerless's own marketing efforts, to market to Local Access's customers and customers' customers, to gain an advantage against Blitz and Local Access in Case III, and to seek a means of terminating its contractual obligations to Local Access, were not just and reasonable, and therefore were unlawful and improper under §201(b) and §222(c) of the Telecommunications Act.

b. Peerless used other parties' CPNI, which Peerless received or obtained through its provision of telecommunication services, to market to Local Access's customers and Local Access's customers' customers, to gain an advantage against Local Access in Case III, and to seek a means of terminating its contractual obligations to Local Access. Such use was violative of §222(c), which prohibits a telecommunications carrier from using CPNI except under narrowly prescribed circumstances.

590.    Pursuant to §206 of the Telecommunications Act, Peerless is liable to Local Access for its violative and unlawful acts for the full amount of the damages

sustained by Local Access as a consequence of Peerless's violative and unlawful acts, together with a reasonable attorneys' fee.

591.    Pursuant to §207 of the Telecommunications Act, Local Access has a right of action to bring suit against Peerless for the damages Local Access incurred as a result of Peerless's violation of §222(c), regardless of whose CPNI Peerless used to harm Local Access.

592.    Local Access first discovered Peerless's comparison of the CPNI in Peerless's records to the CPNI and/or CPI in Local Access's records on February 25, 2019, when Catherine James testified that she had formulated the idea to make the comparison and that Peerless had done it.

593.    Local Access first discovered that Peerless used the comparison of the CPNI in Peerless's records to the CPNI and/or CPI in Local Access's records on October 22, 2019, when Richard Knight gave testimony establishing that Peerless marketed to at least one customer who was the subject of Peerless's comparison of its own records and Local Access's January 2018 Production, as described herein, was part of Peerless's marketing efforts in February and March of 2018.

594.    Prior to October 22, 2019, Peerless and KDW had repeatedly asserted that only the December 2017 Production had been used for Peerless's marketing efforts and that the December 2017 Production had not been compared to Peerless's own records.

595.    With Richard Knight's testimony on October 22, 2019 that established Peerless's use of the January 2018 Production for its own marketing efforts, Local Access first discovered the basis for a cause of action under §222(c) of the

Telecommunications Act relative to Peerless's improper marketing efforts prior to July 2018. Prior to this testimony from Richard Knight, Local Access could not have discovered through reasonable diligence the basis for a cause of action under §222(c) of the Telecommunications Act relative to Peerless's improper use of CPNI for marketing efforts that occurred before July 2018.

596.   In April 2020, Local Access first discovered that Peerless was still using the CPNI described herein for Peerless's marketing efforts and that it was still using that CPNI to steal Local Access's and Blitz's customers.  It was at this time that Local Access discovered the basis for a cause of action under §222(c) of the Telecommunications Act relative to Peerless's improper use of CPNI for marketing efforts that occurred beyond June 2018.

597.   Prior to April 2020, Local Access could not have discovered through reasonable diligence the basis for a cause of action under §222(c) of the Telecommunications Act relative to Peerless's improper use of CPNI for marketing efforts that occurred beyond June 2018.

598.   As a direct and proximate result of Peerless's improper and violative use of CPNI, as described herein, Local Access has suffered actual damages of the following nature:

a.   Peerless used CPNI which Peerless received or obtained by virtue of its provision of telecommunication services, in Peerless's own marketing efforts and to steal Local Access's customers, Local Access's customers' customers, Local Access's traffic, and Local

Access's customers' traffic; all of which resulted in lost revenue for Local Access.

b.   Peerless worked with KDW and Catherine James to analyze CPNI, which Peerless received or obtained by virtue of its provision of telecommunication services, for more effective marketing to Local Access's customers and Local Access's customers' customers, resulting in the loss of revenue for Local Access.

c.   Peerless used CPNI, which Peerless received or obtained by virtue of its provision of telecommunication services, to solicit Local Access's customers and to involve those customers in Peerless's litigation, so as to drive customers and traffic away from Local Access, even when those customers have not moved to Peerless; all of which resulted in lost revenue for Local Access.

d.   Peerless used CPNI to gain an advantage over Local Access in the litigation of Case III and other litigation, thereby causing Local Access to incur damages, attorneys' fees and costs that Local Access would not have incurred but for Peerless's violative use of CPNI.

e.   Peerless used Local Access's and other parties' CPNI for its own efforts toward marketing to Local Access's customers and customers' customers, which resulted in lost revenue for Local Access.

f.   Peerless used CPNI, which Peerless received or obtained by virtue of its provision of telecommunication services, to terminate its contract

with Local Access wrongfully and prematurely, resulting in significant monetary loss to Local Access.

g.  The stay of Case III, which lasted for more than three years, would not have occurred but for Peerless's violations of §222(c) of the Telecommunications Act.  That stay resulted in the expiration of all of the remaining period that Local Access had on its contract with Peerless.  Thus, Local Access has lost the benefit of its contract with Peerless as a result of Peerless's violations of §222(c) of the Telecommunications Act.

h.  The stay of Case III for prosecution of the sanctions arising from Peerless's violations of the Protective Order, which were violative of section 222(c) of the Telecommunications Act, has caused Local Access to incur attorneys' fees and litigation expenses that it would not have otherwise incurred.  While some of these fees and costs were recovered in the sanctions phase of Case III, any fees and costs that were not recovered in that proceeding would be recoverable in this action as damages.

WHEREFORE, LOCAL ACCESS, LLC demands entry of a judgment awarding the following:

a.  All damages sustained by Local Access as a consequence of Peerless's violations and unlawful acts under §222(c) of the Telecommunications Act;

b.  All reasonable attorneys' fees and costs incurred by Local Access in this litigation; and

c. All other relief this Court deems just and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

The plaintiffs demand a trial by jury on all matters so triable as a matter of right.

Respectfully submitted, this **_22nd_** day of **_September_**, 2023.

 */s/ Lee W. Marcus*
**LEE W. MARCUS, ESQUIRE**
Florida Bar No.: 967076
Email:  lmarcus@marcusmyerslaw.com
**ERNEST J. MYERS, ESQUIRE**
Florida Bar No.: 947350
Email:  emyers@marcusmyerslaw.com
MARCUS & MYERS, P.A.
6150 Metrowest Boulevard, Suite 208
Orlando, Florida 32835
Tel:    407-447-2550 / Fax:    407-447-2551
Counsel for Local Access, LLC and
Blitz Telecom Consulting, LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of September, 2023, I electronically

filed the foregoing with the Clerk of the Court by using the CM/ECF system which will

send a notice of electronic filing to all counsel of record.

 */s/ Lee W. Marcus*
LEE W. MARCUS, ESQUIRE
Florida Bar No.: 967076
Email:  lmarcus@marcusmyerslaw.com